UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TODD C. BANK, individually and on behalf of
all others similarly situated,

                      Plaintiff,

                -against-

CREDITGUARD OF AMERICA, FREEDOM DEBT
RELIEF, LLC, FREEDOM FINANCIAL NETWORK,
LLC, and FREEDOM FINANCIAL FUNDING, LLC,

                    Defendants.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**

18-CV-1311 (PKC) (RLM)

PAMELA K. CHEN, United States District Judge:

On March 1, 2018, Plaintiff Todd C. Bank ("Plaintiff" or "Bank") filed the instant *pro se*[1]

action against Defendants Creditguard of America ("CGA") and Freedom Debt Relief, LLC,

Freedom Financial Network, LLC, and Freedom Financial Funding, LLC (the "Freedom

Defendants") (collectively, "Defendants"). Plaintiff alleges that Defendants made unsolicited

automated commercial telemarketing and advertising calls, in violation of the Telephone

Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), and New York General Business Law

("NYGBL") § 399-p, and failed to provide disclosures required by state law. (Complaint

("Compl."), Dkt. 1.)[2]  On June 11, 2018, Plaintiff filed an Amended Complaint. (Dkt. 20.)

---

[1] Though proceeding *pro se*, Plaintiff is an attorney.

[2] Although Plaintiff, an attorney, files this action *pro se* individually and on behalf of
putative classes (Compl. ¶¶ 2–3; Amended Complaint ("Am. Compl."), Dkt. 20, ¶¶ 2–3), he
acknowledged in his briefing and at Oral Argument before the Court on December 11, 2018, that
he is not seeking to serve as class counsel.  (*See* Plaintiff's Brief in Opposition ("Pl.'s Opp."),
Dkt. 32, at 4; Dec. 11, 2018 Minute Entry.)  As the Court noted at Oral Argument, Plaintiff's
inability to serve as class counsel is a matter to be addressed at the time of class certification and
is irrelevant to the Court's resolution of the instant motion to dismiss.  *See Bank v. R & D Strategic
Solutions, LLC*, No. 12-CV-1368 (DLI) (VMS), 2013 WL 1171108, at *1 (E.D.N.Y. Mar. 20,
2013) (clarifying that a *pro se* class representative may not represent the interests of other class

Pending before the Court are Defendants' motions to dismiss the amended complaint in its entirety, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and to strike Plaintiff's federal TCPA class allegations pursuant to Rule 12(f) and Rule 23(d)(1)(D). (Dkt. 25.) For the reasons stated herein, Defendants' motion to dismiss is granted in part and denied in part, and the motion to strike is denied in its entirety.

## BACKGROUND

### I. Factual Background

### A. The Telemarketing Call

On January 10, 2018, Plaintiff, a New York resident, received a telephone call on his residential telephone line; the Caller Identification ("Caller ID") information included the telephone number 248-710-0050 (the "Telemarketing Call"). (Am. Compl., Dkt. 20, ¶ 15.)[3] The following voice recording ("Pre-Recorded Message") was played on the caller's end:

> This is Jennifer with consumer services calling in regards to your current credit-card account[s]. There are no problems currently with your accounts. However, it is urgent that we speak with you about your eligibility for reduced interest rates on your current accounts. Press "1" now to speak to a live operator and –

(*Id.* ¶ 18.)

---

members as both a class representative and class counsel, yet ultimately declining to rule on the issue at the motion to dismiss stage) (citing *Iannacone v. Law,* 142 F.3d 553, 558 (2d Cir. 1998)); *see also Bank v. Caribbean Cruise Line, Inc.,* No. 11–CV–2744 (E.D.N.Y. Sept. 9, 2011), Dkt. 23 (denying defendant's Rule 12(b)(6) motion to dismiss a putative class action complaint filed by Bank as *pro se* plaintiff); *Steinberg v. Nationwide Mutual Insurance Company,* 224 F.R.D. 67, 75–76 (E.D.N.Y. 2004) (certifying class where plaintiff initiated the action as a *pro se*, yet subsequently retained counsel prior to moving for class certification, stating "[b]ecause the plaintiff is no longer seeking to serve as class counsel, there is no longer any argument that his prior role as *pro se* litigant conflicts with his future role as class representative").

[3] In deciding a motion to dismiss under Rule 12(b)(6), the Court must assume as true the allegations in the complaint. *See* Fed. R. Civ. P. 12; *Littlejohn v. City of N.Y.,* 795 F.3d 297, 306–07 (2d Cir. 2015). The Court thus draws all relevant allegations, taken as true, from Plaintiff's Amended Complaint.

Upon hearing "Press '1' now to speak with a live operator, Plaintiff pressed "1," and was transferred to a live operator, who asked Plaintiff several questions about his finances and also asked for his credit card number. (*Id.* ¶¶ 19, 27.) After Plaintiff answered these questions, the operator placed Plaintiff on hold, and a person came on the line, identifying himself as "Ken Wright, a credit advisor with CreditGuard of America." (*Id.* ¶ 28.) Plaintiff (falsely) told both the operator and Wright that his name was "Thomas LaRasche," and that he held credit-card debt of approximately $14,000. (*Id.* ¶¶ 29–31.) The call between Plaintiff and Wright was disconnected. (*Id.* ¶ 32.) Moments later, Plaintiff received a call from Wright, who addressed Plaintiff as "Thomas" (the "Wright Call"). The Caller ID that appeared for the Wright Call was 800-838-7132 and "CreditcardAmer.," which belonged to CGA. During the call, Wright told Plaintiff that CGA was a nonprofit credit counseling and debt-management company. (*Id.* ¶¶ 33–37.)

**B**. **Plaintiff's Subsequent Calls Seeking Information about the Telemarketing Call**

Plaintiff subsequently dialed another number, 800-853-0065, which belonged to CGA, and spoke with a representative named "Sue" (the "853 Call"). During that conversation, Plaintiff told Sue that his last name was LaRasche, to which Sue responded, "Thomas? . . . you were speaking with Mr. Wright, Ken?" Plaintiff also informed Sue that "I got a call earlier from someone," to which Sue responded, "[you] spoke with someone from Freedom Financial," further explaining that "they are a debt-settlement company, and when you don't qualify for their program, or you're not interested, they transfer you to us, so that we can give you information on our debt-management program. And that's what happened. You got transferred to us, and you spoke with Ken, and he gave you information on our company." (*Id.* ¶¶ 39–47.) Plaintiff subsequently spoke with a supervisor, "Peter," on the 853 Call, who stated "apparently you were transferred to

us from Freedom Financial. Freedom Financial is what they call a debt-settlement company, and for one reason or another, people that they can't help they refer to us. We are a non-profit counseling agency." (*Id.* ¶ 51.) Peter also noted that, according to his "list," one of the telephone numbers that belonged to Freedom Financial was "800-334-4651," but at the time of the conversation, that number belonged to CGA. (*Id.* ¶¶ 52–53.)

Plaintiff made yet another call to the number 659-571-0961 (the "571 Call"), in which Plaintiff spoke to Greg Townsend, an employee of Freedom Financial and Freedom Debt Relief. (*Id.* ¶¶ 54–56.) During the 571 Call, Townsend stated that "your balances aren't enough for our program; that would be the only reason why we would transfer you to [CGA]." (*Id.* ¶ 59.) Townsend characterized CGA as "our affiliate, partner that we use for consumers that have credit-card debt under [$7,500]." (*Id.* ¶ 60.) Acknowledging that Plaintiff, posing as "Mr. LaRashe," had claimed to have debt in excess of this amount, Townsend stated "the representative made a mistake. I can certainly help you. Were you looking to consolidate some debts?" (*Id.*) He clarified that "[i]f you have more than [$7,500] in credit-card debt, then our program is better than CreditGuard, cause we can save you more money. We'd only transfer you over there if you had under [$7,500] in credit-card debt. But if you want to talk to them, that's fine, but our program is going to be better than theirs." (*Id.* ¶ 61.)

Plaintiff subsequently held a conference call with Peter and someone named "CC" of CGA, as well as Daniel Kelly of Freedom Debt Relief. (*Id.* ¶¶ 62–65.) On the conference call, Kelly confirmed that CGA was an "affiliate" or "partner" of Freedom Debt Relief and Freedom Financial Network. (*Id.* ¶¶ 65–67.)[4]

---

[4] While Plaintiff clearly alleges that representatives from CGA responded to Plaintiff's inquiries regarding how he was initially contacted—stating "you spoke with someone from

## II.    Procedural Background

Plaintiff filed his original Complaint in this action on March 1, 2018 (Dkt. 1), and an amended complaint on June 11, 2018 (Dkt. 20).   The Court granted Defendants leave to file a motion to dismiss the amended complaint on June 26, 2018.   (June 26, 2018 Order.)   Defendants' motion was fully briefed on August 17, 2018.   (Dkts. 25–34.)   The Court heard oral argument on Defendants' motion on December 11, 2018.   (Dec. 11, 2018 Minute Entry.)

## LEGAL STANDARDS

## I.    Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a claim over which the Court lacks subject matter jurisdiction.   Fed. R. Civ. P. 12(b)(1).   The party asserting subject matter jurisdiction has the burden to prove the Court's jurisdiction by a preponderance of the evidence.   *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000) (citing *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir. 1996)).

A motion to dismiss for lack of standing is properly brought under Rule 12(b)(1) because a party must have standing in order to invoke the Court's power to adjudicate the case under Article III.   *See McCrory v. Adm'r of Fed. Emergency Mgmt. Agency*, 600 F. App'x 807, 808 (2d Cir. 2015) (citing *Makarova*, 201 F.3d at 113).   To survive a motion to dismiss for lack of standing, the plaintiff must allege facts that, when accepted as true, "affirmatively and plausibly suggest that it has standing to sue."   *Reyes v. Sofia Fabulous Pizza Corp.*, No. 13-CV-7549 (LAK) (JCF), 2014

_____

Freedom Financial" and "apparently you were transferred to us from Freedom Financial" when referring to the initial Telemarketing Call and transfer (Am. Compl. ¶¶ 48–53)—it is unclear from the face of the pleadings which of the Freedom Defendants the CGA representatives were referring to.   Nonetheless, the Court finds that at the initial pleading stage, Plaintiff has adequately alleged that one or all of the "Freedom Defendants" was involved in the Telemarketing Call.

WL 12768922, at *2 (S.D.N.Y. Apr. 7, 2014), *report and recommendation adopted*, 2014 WL 1744254 (S.D.N.Y. Apr. 24, 2014).   To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).   An injury in fact must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).

A facial challenge to Article III standing under Rule 12(b)(1) may be "based solely on the allegations of the complaint or the complaint and exhibits attached," but in the event of a fact-based jurisdictional challenge under Rule 12(b)(1), extrinsic materials submitted by both parties beyond the allegations in the complaint may be considered.   *Katz v. Donna Karan Co., LLC,* 872 F.3d 114, 119 (2d Cir. 2017) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016)); *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) ("Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings[.]") (quoting *Am. Postal Workers Union v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).   In such cases, however, courts may only use the extrinsic materials to examine jurisdictional facts.   *Azeez v. Ramaiah*, No. 14-CV-5623 (PAE), 2015 WL 1637871, at *2 (S.D.N.Y. Apr. 9, 2015) (holding that the "extrinsic evidence must pertain to jurisdictional facts, . . . [and] not [to] the merits of the plaintiff's case").

## II.     Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).   A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* (quoting *Twombly*, 550 U.S. at 556).   The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."   *Id.* (citation omitted).   Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   *Id.* at 679 (citation omitted).   "In addressing the sufficiency of a complaint, [the Court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the Court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations."   *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

While *pro se* complaints ordinarily are "held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted), and are construed liberally "to raise the strongest arguments that they suggest," *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996), "*pro se* attorneys . . . typically 'cannot claim the special consideration which the courts customarily grant to *pro se* parties.'" *Holtz v. Rockefeller & Co*., Inc., 258 F.3d 62, 82 n.4 (2d Cir. 2001) (quoting *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)); *see also Tracy v. Freshwater,* 623 F.3d 90, 102 (2d Cir. 2010) (observing that "a lawyer representing himself ordinarily receives no [special] solicitude") (collecting cases).

## III.    Federal Rule of Civil Procedure 12(f)

Federal Rule of Civil Procedure 12(f) provides that a Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."   Fed. R. Civ. P. 12(f).

"[M]otions to strike 'are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation.'"  *Crespo v. N.Y.C. Transit Auth.*, No. 01-CV-0671 (ILG), 2002 WL 398805, at *11 (E.D.N.Y. Jan. 7, 2002) (quoting *Lennon v. Seaman*, 63 F. Supp. 2d 428, 446 (S.D.N.Y. 1999)); *see OTG Brands, LLC v. Walgreen Co.*, No. 13-CV-9066 (ALC), 2015 WL 1499559, at *5 (S.D.N.Y. Mar. 31, 2015) (a party seeking to strike allegations must show that evidence in support of the allegation would be inadmissible, the allegations have no bearing on relevant issues, and permitting the allegations to stand would result in prejudice to the movant).  "A motion to strike 'on the ground that the matter is impertinent and immaterial' should not be granted, 'unless it can be shown that no evidence in support of the allegation would be admissible.'"  *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 774 (S.D.N.Y. 2018) (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)).  "Simply because a claim is dismissed . . . does not mean that allegations in support of that claim may as a matter of course be struck as immaterial, impertinent, or scandalous."  *Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 417 (S.D.N.Y. 2012).

## IV.     Federal Rule of Civil Procedure 23(d)(1)(D)

Although motions to strike under Rule 12(f) are generally disfavored at the early pleading stages, Rule 23(d)(1)(D) of the Federal Rules of Civil Procedure provides that a court may "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceeds accordingly."  Fed. R. Civ. P. 23(d)(1)(D).  While the Second Circuit "has not addressed whether a motion to strike class allegations may be brought before a class is certified," courts in this Circuit have held that "such motions may be addressed prior to the certification of a class if the inquiry would not mirror the class certification inquiry and if

resolution of the motion is clear." *Davito v. AmTrust Bank*, 743 F. Supp. 2d 114, 115–16 (E.D.N.Y. 2010) (collecting cases) (internal citations and quotation marks omitted). Thus, the Court may consider a motion to strike class allegations where it is clear that the putative class action claim will not proceed and/or the motion to strike "addresses issues separate and apart from issues that will be decided on a class certification motion." *Chen-Oster v. Goldman, Sachs & Co.,* 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (internal quotations and citation omitted); *see Davito*, 743 F. Supp. 2d at 116.

## DISCUSSION

Defendants, filing jointly on behalf of CGA and the Freedom Defendants, seek to: (1) dismiss Plaintiff's TCPA claims pursuant to Rule 12(b)(6); (2) dismiss Plaintiff's claims under NYGBL § 399-p ("§ 399-p") pursuant to Rule 12(b)(1) and Rule 12(b)(6); and (3) strike class allegations as to both claims pursuant to Rule 12(b)(1), Rule 12(b)(6), Rule 12(f), and Rule 23(d)(1). (Dkt. 25; Defendants' Brief ("Defs.' Br."), Dkt. 27.)

I.       **Claims under the Telephone Consumer Protection Act**

The TCPA prohibits certain unsolicited telemarketing calls for commercial purposes to "any residential landline using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party." 47 U.S.C. § 227(b)(1)(B); 47 C.F.R § 64.1200(a)(3). Plaintiffs in such actions may seek to recover, for each violation, the greater of the monetary loss caused by the violation or $500. 47 U.S.C. § 227(b)(3). Where such violations are willful, Plaintiffs may recover up to $1,500. *Id.* "[C]laims based on alleged violations of the TCPA need not be pled with particularity." *Jackson v. Caribbean Cruise Line, Inc.,* 88 F. Supp. 3d 129, 138 (E.D.N.Y. 2015) (citing *McCabe v. Caribbean Cruise Line, Inc.*, No. 13-CV-6131 (JG), 2014 WL 3014874, at *4 (E.D.N.Y. July 3, 2014))

In moving to dismiss Plaintiff's claims under the TCPA, Defendants argue that Plaintiff fails to state a claim because (1) CGA is a nonprofit exempt from liability under the TCPA, and (2) Plaintiff fails to allege which entity actually initiated the call to his residence. (Defs.' Br. at 5–10.) Plaintiff responds that (1) although he does not yet know which Defendant actually made the allegedly unlawful Telemarketing Call, he has alleged facts from which direct liability and vicarious liability among Defendants may be inferred, and (2) given the commercial nature of the Telemarketing call, no Defendant, including CGA, can invoke the nonprofit exemption to shield itself from liability under the TCPA. (Pl.'s Opp., Dkt. 29, at 7–16; 21–25.) In their reply, Defendants argue, *inter alia*, that Plaintiff's allegations are insufficient to establish vicarious liability, in that they fail to allege an agency or contractual relationship between Defendants. (Defendants' Reply ("Defs.' Reply"), Dkt. 33, at 3–6.) In light of the facts plausibly alleged in the amended complaint, the Court finds that CGA is exempt from liability under the TCPA, but that Plaintiff has adequately stated a claim for relief against the Freedom Defendants.

### A. Applicability of the Nonprofit Exemption to Defendant CGA

The TCPA empowers the FCC to create exemptions to liability under the Act. 47 U.S.C. § 227(b)(2). Pursuant to this authority, the FCC has interpreted 47 U.S.C. § 227(b)(1)'s prohibitions on the use of automated telephone equipment for telemarketing calls as being qualified by certain exemptions, including a "nonprofit exemption." 47 C.F.R § 64.1200(a)(3)(iv). Thus, as interpreted by the FCC, § 227(b)(1) prohibits the "initiat[ion of] any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, *unless* the call . . . [i]s made by or on behalf of a tax-exempt nonprofit organization." *Id.* (emphasis added). Defendants argue that they are *all* shielded from liability under this exemption based on Plaintiff's allegations that the

Telemarketing Call was made by CGA or on behalf of CGA for the purpose of determining whether Plaintiff qualified for CGA's services. (Defs.' Br. at 1–2, 8.) Plaintiff counters that given the commercial telemarketing content of the Telemarketing Call, no Defendant, including CGA, can invoke the nonprofit exemption to avoid liability under the TCPA. (*See* Pl.'s Opp., Dkt. 29, at 21–25.)

Neither party is completely correct. The Court finds that CGA is exempt from liability through the nonprofit exemption, but the Freedom Defendants cannot hide behind CGA to avoid liability for their own commercial telemarketing practices.

### 1. CGA

CGA is shielded from liability under the nonprofit exemption as a categorical matter. The plain language of the regulation leaves no doubt as to this question, as the language is unambiguous: a nonprofit is not liable for the "initiat[ion of] any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party." 47 C.F.R § 64.1200(a)(3)(iv). This exemption will be upheld unless it is inconsistent with the underlying statute. *See Spectrum Pharmaceuticals, Inc. v. Burwell*, 107 F. Supp. 3d 23, 28 (D.D.C. 2015) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984)).

Here, the nonprofit exemption is not inconsistent with the statute; in fact, the exemption appears to mirror definitional language in the statute itself, which defines a "telephone solicitation" as "the initiation of a telephone call or message for [certain commercial purposes], but such term does not include a call or message . . . by a tax[-]exempt nonprofit organization." 47 U.S.C. § 227(a)(4). Furthermore, the nonprofit exemption reflects the fact that the TCPA was not intended to prevent nonprofits from conducting their own telephone-based campaigns or contracting out

their campaigns to for-profit telemarketers. FCC 2003 Report & Order, 18 F.C.C.R. 14014, 14089–90, ¶ 128 (2003). Thus, under the TCPA, telemarketing calls from nonprofit organizations are, by definition, non-commercial. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 8752, 8773–74 (1992) ("[W]e conclude that tax-exempt nonprofit organizations should be exempt from the prohibition on prerecorded message calls to residences as non-commercial calls.").

Since December 14, 2017, the Internal Revenue Service ("IRS") has recognized CGA as a nonprofit 501(c)(3) organization with its principal place of business in Boca Raton, Florida. (Declaration of Shon Lees, Dkt. 26, ¶¶ 2–3; IRS Letter Exhibit, Dkt. 26-1, at ECF[5] 1.) Thus, at the time of the Telemarketing Call on January 10, 2018, CGA was a nonprofit within the meaning of the nonprofit exemption to the TCPA, as defined by the FCC. As even Plaintiff appears to concede, this means that if CGA had initiated the Telemarketing Call itself in order to promote its own services, it would not be liable.[6] (*See* Pl.'s Opp., Dkt. 29, at 21.) By the same logic, CGA cannot be held liable simply because one or more of the Freedom Defendants initiated the call, at

---

[5] "ECF" refers to the pagination generated by the court's CM/ECF docketing system and not the document's internal pagination.

[6] The Court acknowledges that at least one Court has found that nonprofits may lose the benefit of the nonprofit exemption where they initiate telemarketing calls to promote the services of a for-profit entity, rather than their own services. *See Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 828 (N.D. Ill. 2016) ("If [the nonprofit] was acting as a conduit for [for-profit entities] to solicit business and generate profit, then the calls can hardly be said to have been made 'by or on behalf of a tax-exempt nonprofit organization.'" (quoting 47 C.F.R § 64.1200(a)(3)(iv))). Whether correct or not, this ruling is consistent with the Court's holding in this order. *Aranda* is inapplicable here because the facts alleged in the amended complaint do not support the conclusion that CGA made any call to promote the Freedom Defendants' commercial services. Rather, the most that can be inferred from the amended complaint is that the Telemarketing Call was initiated by CGA to promote *its own* services or that one of the Freedom Defendants initiated the call to promote its own and/or CGA's services. Neither scenario implicates the holding in *Aranda*, nor, as discussed *infra*, does either permit the Freedom Defendants to claim the nonprofit exemption.

least in part, on CGA's behalf. Accordingly, the Court finds that Plaintiff has failed to state a claim under the TCPA against Defendant CGA.

### 2. Freedom Defendants

The next question raised by Defendants' motion to dismiss is whether the Freedom Defendants, despite being for-profit telemarketers, are also exempt from liability under the nonprofit exemption, because it can be plausibly inferred from the amended complaint that the Freedom Defendants initiated the Telemarketing Call on behalf of CGA. Plaintiff argues that because the call was allegedly made for the benefit of both CGA and the Freedom Defendants, the nonprofit exemption does not apply to shield the Freedom Defendants' conduct from TCPA liability.

The few courts to apply the nonprofit exemption have found that even for-profit entities may claim the benefits of the exemption in circumstances where they operate on behalf of or in the place of a nonprofit organization. For example, in *Fitzhenry v. Independent Order of Foresters*, a for-profit telemarketer that placed calls seeking to sell funeral insurance on behalf of a nonprofit entity was held to be covered by the exemption. No. 2:14–cv–3690–DCN, 2015 WL 3711287, at *3–4 (D.S.C. 2015). And in *Wengle v. DialAmerica Marketing, Inc.*, a for-profit telemarketer contracted to raise funds on behalf of the nonprofit Special Olympics of Michigan was held to be within the exemption. 132 F.Supp.3d 910, 919 (E.D. Mich. 2015). Thus, as Plaintiff acknowledges, the Freedom Defendants would be covered by the nonprofit exemption if they had made the Telemarketing Call solely on behalf of CGA. (*See* Pl.'s Opp., Dkt. 29, at 21–22.)

Nevertheless, the Court finds the exemption inapplicable to the Freedom Defendants in this case because the Telemarketing Call was made with dual commercial and non-commercial

purposes. In its 2003 Report and Order, the FCC explicitly addressed this issue. FCC 2003 Report & Order, 18 F.C.C.R. 14014, 14087–90. There, it confronted numerous complaints that the "[nonprofit exemption] frequently has been used to veil what is in reality a commercial venture." *Id.* at 14088 ¶ 127. In light of this concern, the FCC issued a clarification of the nonprofit exemption: "If . . . a for-profit organization is delivering its own commercial message as part of a telemarketing campaign (i.e., encouraging the purchase or rental of, or investment in, property, goods, or services), even if accompanied by a donation to a charitable organization or referral to a tax-exempt nonprofit organization, that call is not by or on behalf of a tax-exempt nonprofit organization." *Id.* at 14089 ¶ 128. Even "an affiliate of a tax-exempt nonprofit organization that is itself not a tax-exempt nonprofit is not exempt from the TCPA rules when it makes telephone solicitations." *Id.* at n.419.

In this case, the Freedom Defendants are alleged to have placed the Telemarketing Call for two initial purposes: (1) to determine "whether a person answering the call . . . met the qualifications for the services that were purportedly provided by Freedom Financial" and if so, whether it wished to "use [or decline] such service[s]" (Am. Compl. ¶ 21, 23); and (2) to determine "whether a person answering the call . . . met the qualifications for the services that were purportedly provided by CGA" (*id.* ¶ 22). Thus, the Telemarketing Call is alleged to have had dual commercial and noncommercial purposes. Indeed, there are indications that the commercial purposes predominated here, as the for-profit entity, *i.e.*, one of the Freedom Defendants, made the initial contact, determined for itself whether or not to refer a potential consumer to CGA, and even appeared to market its services as a competitor to the nonprofit's services. (*See id.* ¶ 61 (statement of Greg Townsend, a Freedom Financial employee, that "our program is better than

CreditGuard, [']cause we can save you more money. . . . [I]f you want to talk to them, that's fine, but our program is going to be better than theirs").)

This conduct is clearly inconsistent with the FCC's 2003 description of conduct covered by the nonprofit exemption. Rather, the Telemarketing Call is precisely the type of call that the FCC explained "is *not* by or on behalf of a tax-exempt nonprofit organization," because it "deliver[ed the Freedom Defendants'] own commercial message as part of a telemarketing campaign[,] . . . even [though] accompanied by a . . . referral to [CGA,] a tax-exempt nonprofit organization." FCC 2003 Report & Order, 18 F.C.C.R. 14014, 14089 ¶ 128 (emphasis added). Because the nonprofit exemption to the TCPA is ambiguous when applied to a for-profit entity's initiation of a telemarketing call with dual commercial and noncommercial purposes, the FCC's interpretation of the exemption is entitled to deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Christensen v. Harris County*, 529 U.S. 576, 588 (2000). Thus, the Freedom Defendants may not cloak their commercial telemarketing activity simply by adding a noncommercial element, *e.g.*, CGA's services, to their calls. Because the initial telemarketing call is alleged to have had the commercial purpose of promoting the Freedom Defendants' own services, the Court holds that they are not covered by the nonprofit exemption to liability under the TCPA.

\* \* \*

Accordingly, Defendants' motion to dismiss Plaintiff's claims pursuant to the nonprofit exemption is granted solely as to Defendant CGA and denied as to the Freedom Defendants.

### B. Direct Liability of the Freedom Defendants

The Freedom Defendants also argue that, even if their conduct was governed by the TCPA, Plaintiff has failed to allege that they violated the Act. In order to state a plausible claim of direct

liability for a violation of the TCPA, a plaintiff must allege that a defendant actually initiated an unlawful telemarketing call. *Banks v. Pro Custom Solar*, No. 17-CV-613 (LDH) (JO), 2018 WL 3637960, at *2 (E.D.N.Y. July 31, 2018). Defendant argues that Plaintiff has failed to do so because he fails to specify which Defendant initiated the Telemarketing Call.

In the amended complaint, Plaintiff alleges that the initial Telemarketing Call did not state the name of the organization or person on whose behalf the call was placed. (Am. Compl. ¶ 69.) He does, however, allege that in the course of his follow-up investigation and conversations with various CGA and Freedom Defendant-affiliated individuals, he confirmed that the live operator he was connected to as part of the Telemarketing Call was "someone from Freedom Financial." (*Id.* ¶ 46.) Though "Freedom Financial" could plausibly refer to any one of the Freedom Defendants, Plaintiff further alleges that all of the Freedom Defendants have done business as "Freedom Financial" and share the same principal place of business. (*Id.* ¶¶ 11–14.)

The Court finds that these allegations are sufficient to raise a plausible inference that at least one of the Freedom Defendants was responsible for initiating the Telemarketing Call. "Time will tell which of the Defendants, if any, actually" initiated the Telemarketing call and, thus, would be directly liable for a violation of the TCPA. *Alberti v. Ron Lewis Automotive Group*, No. 2:05-CV-100, 2006 WL 2773254, at *6 (W.D. Pa. Sept. 12, 2006). But "it is not [Plaintiff's] burden at this juncture to come forward with allegations or evidence conclusively negating the possibility" that none of the Freedom Defendants initiated the Telemarketing Call. *Morris v. SolarCity Corp.*, No. 15-cv-05107-RS, 2016 WL 1359378, at *2 (N.D. Cal. Apr. 6, 2016). Rather, at the pleadings stage, Plaintiff need only plead "factual content [that] allows the court to draw the *reasonable inference* that [one of the Freedom Defendants] is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added). Because Plaintiff has done so, his claims against the Freedom Defendants will proceed to discovery.

### C. Vicarious Liability of the Freedom Defendants

Even if the Court were to find that Plaintiff has failed to allege direct liability against the Freedom Defendants, it would still find that he has stated a claim against each Defendant based on a theory of vicarious liability.

It is well settled that a defendant may also be held [vicariously] liable under the TCPA consistent with traditional agency principles. *Pro Custom Solar.,* 2018 WL 3637960, at *2 (citing *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016), *as revised* (Feb. 9, 2016)). A plaintiff need not establish that a contractual relationship existed in order to plead vicarious liability under the TCPA; what is required are sufficient factual allegations that give rise to an inference of aiding and abetting the conduct or an agency relationship. *McCabe v. Caribbean Cruise Line, Inc.*, No. 13-CV-6131 (JG), 2014 WL 3014874, at *3 (E.D.N.Y. July 3, 2014) ("[T]raditional principles of vicarious liability apply to actions brought under the TCPA because any other interpretation would allow companies to evade TCPA liability simply by creative contracting." (internal quotations and citations omitted.)). To the extent that the amended complaint does not allege that all of the Freedom Defendants will ultimately be found directly liable for initiating the Telemarketing Call, the Court finds that it sufficiently alleges that each are vicariously liable for the initiation.

As stated above, Plaintiff alleges that all of the Freedom Defendants have done business as "Freedom Financial" and "Freedom Debt Relief." (Am. Compl. ¶ 14.)[7] As the Court

---

[7] Plaintiff also argues that CGA can be held vicariously liable for the conduct of the Freedom Defendants. The Court rejects that argument both because the factual allegations in the amended complaint do not support such an inference and because such a finding is contradicted by the governing law and principles regarding the protections afforded nonprofit entities such as CGA under the TCPA, discussed *supra*.

understands this allegation, it is that the Defendants engaged in business *collectively*, rather than individually. Thus, while the name "Freedom Financial" could formally refer to only one of the Defendants, that name, as alleged by Plaintiff, refers to all of the Defendants engaged in business together. Plaintiff's allegations that the Freedom Defendants maintained a commingled business relationship (*id.*), that Freedom Defendant affiliates confirmed that the live operator on the telemarketing call was "someone with Freedom Financial" (*id.* ¶¶ 46, 51, 60), and that all of the Freedom Defendants share a single place of business (*id.* ¶¶ 11–13), raise the reasonable inference that each Freedom Defendant acted with the apparent authority and ratification of the others. *See Pro Custom Solar.,* 2018 WL 3637960, at *3 ("[A]pparent authority . . . arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him." (quoting *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 69 (2d Cir. 2003))); *Hamm v. United States*, 483 F.3d 135, 140 (2d Cir. 2007) ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." (quoting Restatement (Second) of Agency § 82 (1958))). The Court finds further factual support for Plaintiff's theory of vicarious liability in the alleged overlap in personnel and business among the Freedom Defendants. (*See* Am. Compl. ¶ 59 (quoting Greg Townsend, an employee of both Freedom Debt Relief and Freedom Financial Network, as describing "our [debt settlement] program"); *id.* ¶ 67 (quoting Daniel Kelly, a Freedom Debt Relief employee, as stating that CGA was an "affiliate" or "partner" of *both* Freedom Debt Relief and Freedom Financial Network).) Taken together, Plaintiff's allegations are sufficient to state a TCPA claim against all three

Freedom Defendants and entitle Plaintiff to discovery.[8]  *Accord Charvat v. Allstate Corp.*, 29 F.

Supp. 3d 1147, 1150–51 (N.D. Ill. 2014) (denying a motion to dismiss where the plaintiff failed to

identify the entity that initiated the telemarketing call because the defendants were the party best

positioned to know those facts).

### D.  Sufficiency of the Pleadings Under Rule 8

Defendants also argue that Plaintiff's allegations against the Freedom Defendants fail to

satisfy Rule 8's pleading requirements in that they do not distinguish among the Freedom

Defendants.   The Court rejects this argument and finds, as previously discussed, that Plaintiff has

sufficiently alleged the commingling of roles among "some combination of" Defendants in

marketing commercial debt consolidation services.  *Aranda,* 179 F. Supp. 3d at 829; In re Rules

and Regulations Implementing the Telephone Consumer Protection Act of 1991 ("FCC 2003

Report & Order"), 18 F.C.C.R. 14014, 14089–90 ¶ 128; (Am. Compl. ¶¶ 48–53, 74 (alleging that

Defendants, not an authorized dealer or third party, "placed, or directed the placement of" the

Telemarketing Call).).   As the court observed in *Aranda*, "[P]laintiff[] ha[s] no obligation under

federal pleading rules to apprise [D]efendants of [his] legal theories in [his] complaint.   The

bottom line is that [D]efendants have been on notice since near the outset of the case that

---

[8]  The Court notes that there are three prior cases in which Plaintiff Bank's pleadings were found insufficient to state a claim under an agency theory because he alleged only that the defendants made a phone call "with the authorization of, and in concert with, the [defendants]," and provided no further factual allegations to support an inference of a contractual or other agency relationship that could give rise to vicarious liability.  *Bank v. All. Health Networks, LLC,* No. 15-CV-213 (JG) (VMS), 2015 WL 4645317, at *1 (E.D.N.Y. Aug. 4, 2015), *aff'd,* 669 F. App'x 584 (2d Cir. 2016) (citing *McCabe v. Caribbean Cruise Line, Inc.,* No. 13–CV–6131 (JG), 2014 WL 3014874 (E.D.N.Y. July 3, 2014) and *Bank v. Philips Electronics North American Corp.,* No. 14–CV–5312 (JG) (VMS), 2015 WL 1650926 (E.D.N.Y. Apr. 15, 2015)).   This case is different, in that Plaintiff alleges, *inter alia*, that statements made by representatives of both CGA and the Freedom Defendants appear to represent the Freedom Defendants as engaged in a unified enterprise.   (Am. Compl. ¶¶ 46, 51, 60.)

[P]laintiff[] seek[s] to hold them vicariously or jointly liable, and that is all [P]laintiff[] [is] required to do." 179 F. Supp. 3d at 830. Indeed, the core point of Plaintiffs' allegations against the Freedom Defendants is "that it is difficult to tell where one [D]efendant stops and the next one starts." *Birchmeier v. Caribbean Cruise Line, Inc.,* No. 12-CV-4069 (MFK), 2012 WL 7062748, at *1 (N.D. Ill. Dec. 31, 2012). Under such circumstances, Plaintiff need not specify in detail the actual relationship and division of responsibilities among the Freedom Defendants in order to satisfy Rule 8.

## II. Plaintiff's State Law Claims

Defendants make two persuasive arguments with regard to dismissal of Plaintiff's § 399-p claim under the NYGBL. First, they argue that Plaintiff lacks Article III standing to bring the claim because he does not allege any injury-in-fact, requiring dismissal for lack of subject matter jurisdiction under Rule 12(b)(1). Second, they argue that, even if Plaintiff could demonstrate standing, he fails to adequately state a claim upon which relief could be granted under Rule 12(b)(6). (Defs.' Br. at 11–15.)

Section 399-p provides that "[w]henever telephone calls are placed through the use of an automatic dialing-announcing device," they are required to "(a) state at the beginning of the call the nature of the call and the name of the person or on whose behalf the message is being transmitted and at the end of such message the address, and telephone number" of that person, provided such disclosures are not otherwise prohibited by law, and "(b) disconnect the automatic dialing-announcing device from the telephone line upon the termination of the call by either the person calling or the person called." N.Y. Gen. Bus. Law § 399-p(3).

## A. Rule 12(b)(1) Dismissal: Article III Standing and Injury-in-Fact

The Second Circuit has recognized that "in the absence of a connection between a procedural violation and a concrete interest, a bare violation of the former does not manifest an injury in fact." *Strubel v. Comenity Bank*, 842 F.3d 181, 189 (2d Cir. 2016) (applying *Spokeo v. Robins,* 136 S.Ct. 1540 (2016)). "Nonetheless, . . . under some circumstances, 'an alleged procedural violation can by itself manifest concrete injury where [the legislature] conferred the procedural right to protect a plaintiff's concrete interests and where the procedural violation presents a risk of real harm to that concrete interest.'" *Jenkins v. Nat'l Grid USA Serv. Co., Inc.*, No. 15-CV-1219 (JS) (GRB), 2017 WL 4250511, at *4 (E.D.N.Y. Sept. 22, 2017) (quoting *Strubel*, 842 F.3d at 189 (internal quotation marks omitted)). "Thus, district courts should consider 'whether the particular bare procedural violation may present a material risk of harm to the underlying concrete interest [the legislature] sought to protect.'" *Id.* (citing *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 861 F.3d 76, 80–81 (2d Cir. 2017)).

### 1. No Concrete Harm or Risk of Harm Alleged

Here, Plaintiff does not appear to allege any concrete harm under § 399-p. This case is materially similar to *Jenkins*, in which the Honorable Joanna Seybert found that the several seconds that the plaintiffs had to wait in order to receive the disclosures required by the statute (*i.e.*, the name of the person or entity initiating the telemarketing call, and the address or telephone number of the caller at the end of the call) amounted to minimal injury, at best, and was not contemplated as injury by the state legislature in enacting § 399-p. 2017 WL 4250511, at *9. Plaintiff attempts to distinguish his case from *Jenkins* by arguing that he had to spend a full 20 minutes seeking out the required disclosures by speaking with a live representative, which he

asserts is the type of injury that the statute was meant to prevent.[9]  (Dec. 11, 2018 Oral Argument; Dkt. 31, at ECF 9–10; Legislative History of NYGBL 399-p, Dkt. 30-1.)  In the legislative history for § 399-p, however, a memo from the State Consumer Protection Board noted that the purpose of § 399-p was "[t]o protect a consumer's access to his/her telephone line by requiring an automatic dialing-announcing device to disconnect when the consumer terminates the call."  In addition, the Statement in Support of the legislation noted that "a mother was delayed for five minutes in using her own phone in order to obtain emergency medical assistance for her son because of an incoming computerized solicitation call."  (Dkt. 30-1, at ECF 13–14.)

By contrast, here, the Telemarketing Call made to Plaintiff was disconnected after he pressed "1" to speak with a live operator.  (Am. Compl. ¶¶ 28–32.)  The next 20 minutes that Plaintiff spent on the phone was on his *own* initiative, *after the call had been disconnected*. During that time, Plaintiff re-dialed several numbers to determine the source of the Telemarketing Call and presumably other information for this lawsuit.  (*Id*. ¶¶ 38–67.)  The automated calling service certainly did not deny him access to his residential phone line to make or receive other calls.  Therefore, Plaintiff fails to allege any injury contemplated by the legislature in enacting § 399-p that would establish standing.

---

[9] Even assuming, *arguendo,* Plaintiff were otherwise able to demonstrate injury or Article III standing, Defendants also successfully argue that Plaintiff fails to state a claim for a violation of § 399-p, because (1) Plaintiff himself alleges that he cut off the pre-recorded message by pressing "1" before ever reaching the end of the message to determine whether he would be given a number to reach the person or entity that initiated the call; and that (2) the portion of the message he did hear actually did provide information required under NY GBL 399-p(3): the name of the person, *i.e.*, "Jennifer," and the nature and subject of the call, *i.e.*, reduced interest rates for Plaintiff's credit card accounts.  (Defs.' Br. at 12–13 (citing Am. Compl. ¶ 18).)  Plaintiff's primary argument that no such information would have played if he had not "pressed 1" is also speculative.  The Court simply cannot credit conclusory and implausible allegations.  *Iqbal*, 556 U.S. at 681 (declining to credit "bare assertions"); Fed. R. Civ. P. 12(b)(6).

Plaintiff's strained attempts at oral argument to compare the "risk of harm" contemplated under § 399-p to the material risk of harm contemplated by federal voting rights and anti-discrimination statutes are unavailing here. (Dec. 11, 2018 Minute Entry.) At oral argument, Plaintiff specifically referred to the "voting rights cases" cited in *Spokeo* as authority for the premise that Plaintiff "need not allege any *additional* harm beyond the one Congress has identified," *Spokeo,* 136 S. Ct. at 1549–50 (citing *FEC v. Akins*, 524 U.S. 11 (1998) and *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989)). As the Court clarified at oral argument, unlike the instant case, the voting rights cases in *Spokeo* specifically found that the lack of public disclosure with regard to voting information is a concrete and particular injury relating to a fundamental constitutional right that was specifically identified by Congress in passing the two statutes at issue in those cases, the Federal Election Campaign Act and the Federal Advisory Committee Act. *See Dolan v. Select Portfolio Servicing,* No. 03-CV-3285 (PKC) (AKT), 2016 WL 4099109, at *3–4 (E.D.N.Y. Aug. 2, 2016) (observing that the federal statutes at issue in *Akins* and *Public Citizen* "were drafted to effectuate broad disclosure of information to the public". Similarly, because anti-discrimination statutes, such as the Federal Fair Housing Act, were enacted specifically to mitigate the risk of harm to the public posed by racial discrimination, courts have found that injury-in-fact is established by the mere violation of the statute. *Spokeo*, 136 S. Ct. at 1553 (Thomas, J., concurring), 1555 (Ginsburg, J., and Sotomayor, J., dissenting) (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373–74 (1982) (in Fair Housing Act case, finding that a "tester" who approached a real estate agent and received false information in violation of the Fair Housing Act demonstrated injury-in-fact, even though the tester had no intent to buy or rent a home)). Here, no such public harm is implicated by the mere violation of § 399-p's disclosure requirements.

In addition, the Second Circuit has further clarified that "a plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm to that underlying interest." *Strubel,* 842 F.3d at 190 (citing *Spokeo*, 136 S. Ct at 1549); *Jenkins,* 2017 WL 4250511, at *4 (quoting *Strubel*, 842 F.3d at 189; *Crupar-Weinmann*, 861 F.3d at 80–81). Here, the failure to provide mandatory disclosures under § 399-p presents no material "risk of harm" to the underlying interest contemplated by the New York State Legislature in enacting § 399-p, namely, "[t]o protect a consumer's access to his/her telephone line by requiring an automatic dialing-announcing device to disconnect when the consumer terminates the call." (Dkt. 30-1, at ECF 13–14.) Plaintiff points to a June 8, 1988 memorandum written by New York Attorney General Robert Abrams for approval of S. 7224-B (ultimately codified at § 399-p), which states, "[b]y requiring that automatic dialers disconnect immediately when a consumer hangs up, and that basic identification information regarding those responsible for such calls be disclosed, both the public and industry will be responsibly served." (Pl.'s Opp., Dkt. 31, at 10 (citing Memorandum for the Governor by Attorney General Robert Abrams, dated June 8, 1988,); Dkt. 30-1, at ECF 23.) However, Attorney General Abrams's testimony remains consistent with the bulk of the legislative history, which expressly states that § 399-p was designed to be "responsive to consumer complaints that telephone lines have been literally seized, albeit temporarily, by automatic dialers." (*Id*. at 22.) The inability to obtain the caller's identifying information is not the underlying harm that § 399-p was designed to protect; rather, the underlying interest protected by § 399-p is the consumer's need to have access to his or her phone as soon as he or she hangs up. (*see generally* Dkt. 30-1.)

Thus, the Court grants Defendant's motion to dismiss Plaintiff's § 399-p claim under Rule 12(b)(1) for lack of standing.[10]

### III.  Motions to Dismiss and/or Strike Putative Class Claims

#### A.  Plaintiff's Putative § 399-p Class Claims

Although motions to strike under Fed. R. Civ. P 12(f) are generally disfavored at the early pleading stages, they may be granted where it is obvious or otherwise clear from the face of the pleading that the matter cannot proceed on a class-wide basis, and there is a basis separate and apart from issues that may be decided on class certification which otherwise bear on the application to strike class allegations.  *Davito,* 743 F. Supp. 2d at 115 (a motion may be entertained "if the inquiry would not mirror the class certification inquiry and if resolution of the motion is clear" ); *accord Chen-Oster,* 877 F. Supp. 2d at 117   (an exception to the general rule exists when the motion to strike "addresses issues separate and apart from issues that will be decided on a class certification motion") (internal quotations and citation omitted).   Here, because Plaintiff's § 399-p claim is dismissed for lack of standing, his class claim as to this cause of action must also be dismissed.  *Davito,* 743 F.Supp.2d at 115; *Chen-Oster*, 877 F. Supp. 2d at 117.   Thus, the Court grants Defendants' motion to dismiss Plaintiff's putative class allegations with regard to his § 399-p claim under Rule 12(b)(1) and grants Defendants' motion to strike such claims and allegations from the amended complaint under Rule 12(f) and 23(d)(1)(D).

---

[10]  Because Plaintiff's § 399-p claim is dismissed under Rule 12(b)(1), the Court does not address Defendants' Rule 12(b)(6) arguments.

### B.    Plaintiffs' Putative TCPA Class Claims

In moving to dismiss Plaintiff's putative TCPA class claims, Defendants rely on *Bristol-Meyers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773 (2017), in which the Supreme Court held that a forum-state resident plaintiff could not assert claims in state court on behalf of non-forum state residents against a corporate defendant over which the court had no general jurisdiction.   (Defs.' Br. at 18–19.)   Defendants argue that under the reasoning of *Bristol-Meyers*, general jurisdiction cannot be asserted over Defendants because (1) CGA is a Florida corporation, and (2) the Freedom Defendants are limited-liability Delaware corporations with principal places of business in California, and there may be non-New York class members who would undermine the Court's jurisdiction over the TCPA class claims.   (Defs.' Br. at 19 (citing Am. Compl. ¶¶ 10–13).)

As an initial matter, the applicability of *Bristol-Meyers* to federal courts is uncertain at best. The Supreme Court explicitly left open the question of whether *Bristol-Meyers* should extend to the federal courts or, as underscored by Justice Sotomayor in her dissent, whether it should be applied to nationwide class actions.   Given "the unsettled nature of the law following *Bristol-Meyers*," the Court declines to consider whether to dismiss the TCPA class claim until a class certification is sought.   *See Gonzalez v. Costco Wholesale Corp.,* No. 16-CV-2590 (NGG) (JO), 2018 WL 4783962, at *7–8 (E.D.N.Y. Sept. 29, 2018); *Campbell v. Freshbev LLC,* 322 F. Supp. 3d 330, 336–37 (E.D.N.Y. 2018) (noting same)).[11]   Notably, in contrast to *Bristol-Meyers*, there

---

[11] While these questions have "not yet been resolved by the Supreme Court or the circuit courts, and federal district courts are split," *Gonzalez,* 2018 WL 4783962, at *7 (citing § 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 6:26 (5th ed. 2018)), the Court observes that most district court decisions have held that *Bristol-Myers* does not apply to federal class actions.   *See Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharm., Inc.,* 353 F. Supp. 3d 678, 691 (M.D. Tenn. 2018) (collecting cases) (quoting *Chernus v. Logitech, Inc.,* No. 17-673

are no actual "non-forum state plaintiffs" or putative class members to speak of yet in this case, making Defendants' motion to dismiss or strike patently premature. *See Chen-Oster*, 877 F. Supp. 2d at 117 (finding that motions to strike putative class claims are disfavored prior to class certification and before plaintiffs are permitted to complete discovery). Furthermore, Defendants do not challenge specific jurisdiction based on Plaintiff's claims at this stage.

Defendants also argue that Plaintiff is not an adequate class representative and that he would have no standing to represent putative class members who received telemarketing calls

---

(FLW), 2018 WL 1981481, at *7 (D.N.J. April 27, 2018) ("[A]lthough district courts are divided on whether *Bristol-Myers* applies in the federal class action context, the cases have 'universally held that in a putative class action (1) courts are only concerned with the jurisdictional obligations of the named plaintiffs; and (2) unnamed class members are irrelevant to the question of specific jurisdiction.'")); *Lee v. Branch Banking & Tr. Co.,* No. 18-CV-21876 (RNS), 2018 WL 5633995, at *6 (S.D. Fla. Oct. 31, 2018) (collecting cases) ("The Court is persuaded by the growing body of law amongst district courts in this Circuit holding that *Bristol-Myers* does not bar claims of non-resident members of a putative class from asserting claims in federal court under the TCPA."); *Gonzalez,* 2018 WL 4783962, at *7 (quoting *Beach v. Citigroup Alternative Investments LLC,* No. 12-CV-7717 (PKC), 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014) ("In an action brought as a class action, personal jurisdiction is based on a defendant's contacts with the forum state and actions giving rise to the *named* plaintiffs' causes of action . . . *Contacts with unnamed class members may not be used as a jurisdictional basis, especially before a class has been certified.*") (emphasis added)).

Indeed, there are district courts that deny such motions by defendants on the merits, even prior to a motion for class certification. *See, e.g., Dennis v. IDT Corp.,* No. 1:18-CV-2302 (LMM), 2018 WL 5631102, at *3 (N.D. Ga. Oct. 18, 2018) ("[A]fter careful consideration, the Court joins the majority of district courts who have addressed this issue in finding that *Bristol-Myers* does not prevent this Court's assertion of specific jurisdiction over Defendants with regard to the claims of the putative non-resident class members."); *Brotz v. Simm Assocs., Inc.,* No. 6:17-CV-1603 (ORL) 40 (TBS), 2018 WL 4963692, at *3 (M.D. Fla. Oct. 15, 2018); *Knotts v. Nissan N. Am., Inc.,* 346 F. Supp. 3d 1310, 1335(D. Minn. 2018) (noting that "[t]he efficient administration of class actions would be compromised by requiring the Court to make personal jurisdiction determinations for every named and potential unnamed plaintiff, particularly at the outset of the litigation. Such an unwieldy process would defeat the purpose of the class action mechanism.") Thus, while the Court could deny Defendants' motion to strike the putative TCPA class claims on the merits prior to a motion for class certification, the Court declines to decide the issue at this early stage of the case.

(from the Freedom Defendants) on their cellular phones. (Defs. Br.at 17–18 (citing 47 U.S.C. §§ 227(b)(1)(B), 227(b)(1)(A)(iii)).) The Court finds Defendants' arguments premature, but they may be re-raised on a motion for class certification.

Accordingly, the Court denies Defendants' motion to dismiss or strike the TCPA class claims and allegations at this stage of litigation.

## CONCLUSION

For the reasons stated herein:

(1) Plaintiff's TCPA claim as to Defendant CGA is dismissed;

(2) Plaintiff's § 399-p claims and putative § 399-p class claims as to all Defendants are dismissed;

(3) Defendant CGA is terminated as a party in this action; and

(4) All class allegations relating to Plaintiff's putative § 399-p class claims are stricken from the amended complaint.

By April 12, 2019, Plaintiff shall file a second amended complaint excising the class allegations relating to the putative § 399-p class claims.

The Court denies Defendants' motion to dismiss Plaintiff's TCPA claims against the Freedom Defendants, as well as their motion to strike Plaintiff's putative federal TCPA class claims. Accordingly, Plaintiff's individual and putative class claims under the TCPA against the Freedom Defendants shall proceed.

SO ORDERED.

*/s/ Pamela K. Chen*
PAMELA K. CHEN

UNITED STATES DISTRICT JUDGE

Dated: March 22, 2019
      Brooklyn, New York