UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD C. BANK, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　　　　　*Plaintiff*,<br><br>　　　-against-<br><br>CREDITGUARD OF AMERICA, INC., FREEDOM DEBT RELIEF, LLC, FREEDOM FINANCIAL NETWORK, LLC, and FREEDOM FINANCIAL NETWORK FUNDING, LLC,<br><br>　　　　　　　　　　　　　　*Defendants*. | 1:18-cv-01311-PKC-RLM |

## <u>NOTICE OF MOTION</u>

**PLEASE TAKE NOTICE** that, upon the accompanying Declaration of Todd C. Bank, the accompanying Memorandum of Law, and all of the other pleadings and proceedings herein, Plaintiff will move the Court, on a date and at a time to be determined by the Court: (1) pursuant to Rule 11 of the Federal Rules of Civil Procedure, for sanctions against Neil E. Asnen and Klein Moynihan Turco LLP; and (2) for any other additional just and proper relief.

Dated: May 20, 2019

　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　**s/ *Todd C. Bank***
　　　　　　　　　　　　　　　　　TODD C. BANK,
　　　　　　　　　　　　　　　　　 ATTORNEY AT LAW, P.C.
　　　　　　　　　　　　　　　　　119-40 Union Turnpike
　　　　　　　　　　　　　　　　　Fourth Floor
　　　　　　　　　　　　　　　　　Kew Gardens, New York 11415
　　　　　　　　　　　　　　　　　(718) 520-7125
　　　　　　　　　　　　　　　　　By Todd C. Bank

　　　　　　　　　　　　　　　　　*Counsel to Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD C. BANK, Individually and on Behalf of All Others Similarly Situated, *Plaintiff*, -against- CREDITGUARD OF AMERICA, INC., FREEDOM DEBT RELIEF, LLC, FREEDOM FINANCIAL NETWORK, LLC, and FREEDOM FINANCIAL NETWORK FUNDING, LLC, *Defendants*. | 1:18-cv-01311-PKC-RLM |

## DECLARATION OF TODD C. BANK

1.      I am the plaintiff in the above-captioned matter.

2.      Annexed hereto as Exhibit "A" is a copy of the transcript of the oral argument of December 11, 2018, which I purchased in order to respond to the motion for sanctions by former Defendant, CreditGuard of America, Inc.

3.      Annexed hereto as Exhibit "B" is a copy of the invoice for the transcript described in paragraph "2."

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

_s/ **Todd C Bank**_
Todd C. Bank
Executed on May 20, 2019

# Exhibit "A"

## Transcript of Oral Argument

## December 11, 2018

1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF NEW YORK

3    TODD C. BANK,                        ) Civil Action
                                          ) No. 18-1311 (PKC)
4                    Plaintiff,           )
                                          ) ORAL ARGUMENT
5    vs.                                  )
                                          ) Brooklyn, New York
6    CREDITGUARD OF AMERICA, INC.,        ) Date:  December 11, 2018
     et al,                               ) Time:  2:00 p.m.
7                                         )
                     Defendants.          )
8    _____

9              TRANSCRIPT OF ORAL ARGUMENT
                       HELD BEFORE
10       THE HONORABLE JUDGE PAMELA K. CHEN
             UNITED STATES DISTRICT JUDGE
11   _____

12                 A P P E A R A N C E S

13   For the Plaintiff:        Todd C. Bank, Esq.
                               119-40 Union Turnpike, Fourth Floor
14                             Kew Gardens, New York
                               718-520-7125
15

16   For the Defendants:       Neil Asnen, Esq.
                               Klein Moynihan Turco LLP
17                             450 Seventh Avenue, 40th Floor
                               New York, New York  10123
18                             212-246-0900

19

20

21   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
22   _____

23   Court Reporter:           Annette M. Montalvo, CSR, RDR, CRR
                               Official Court Reporter
24                             United States Courthouse, Room N375
                               225 Cadman Plaza East
25                             Brooklyn, New York  11201
                               718-804-2711

2

1          (WHEREUPON, commencing at 2:03 p.m., the following

2    proceedings were had in open court, to wit:)

3          THE COURTROOM DEPUTY:  Civil cause for oral

4    argument, Docket 18-CR-1311, *Bank v. CreditGuard of America*

5    *Inc. et al*.

6          Will the parties please state their appearances for

7    the record.

8          MR. BANK:  Good afternoon, Todd Bank for the

9    plaintiff.

10          THE COURT:  Good afternoon.

11          MR. ASNEN:  Good afternoon, Your Honor.  Neil Asnen

12    for the defendants.

13          THE COURT:  Good afternoon to you as well.

14          As the parties know, we are here for oral argument,

15    as requested by defendants on their motion to dismiss and to

16    strike the complaint and portions thereof in this matter.  And

17    to, in effect, terminate this action via the dismissal

18    motions.

19          What I am going to do is I am going to let you

20    start, Mr. Asnen, and supplement or reiterate whatever

21    arguments you have made in your written submission, and then

22    I'll let Mr. Bank respond.  Just as a warning, I may interrupt

23    you, to the extent that you are making arguments, just to ask

24    you some questions that I may have about points that you are

25    going to make.  But I will give you the floor to make whatever

3

1   arguments you want to at this point, and to let Mr. Bank

2   respond.

3          MR. ASNEN:  Sure, and I will welcome any questions

4   that Your Honor has, as much of my argument has already been

5   stated in the papers.

6          THE COURT:  Go ahead.

7          MR. ASNEN:  Good afternoon, Your Honor.

8          Before the Court today, as you mentioned, is

9   defendants' motion to dismiss and/or strike all or portions of

10  the complaint.  As Your Honor knows, the plaintiff brought

11  claims for relief in three different tranches.  He asserted a

12  TCPA claim over which the Court has original jurisdiction, he

13  asserted a New York state claim, and he asserted various class

14  claims.

15         The defendants made one motion directed to all three

16  versions of that complaint, but I think it's worth noting at

17  the outset that plaintiff took the opportunity to submit three

18  separate opposition memos, and to the defendants' prejudice,

19  and likely to the Court's prejudice, forced us to expend a lot

20  more time and expense, when all of this could have been

21  briefed, as defendants did, within the confines of Your

22  Honor's individual practices.

23         Nevertheless, I guess I'll start with the federal

24  claims over which the Court has original jurisdiction.

25         The defendants' positions that the TCPA claims are

4

1    subject to dismissal for two separate and distinct reasons,

2    the first of which is a pleading deficiency, failure to state

3    a claim.  The complaint makes clear that none of the

4    defendants initiated the subject call.  The letter --

5            THE COURT:  Let me stop you on that.

6            I have trouble understanding how you, as a

7    representative of all of the defendants, so that will be CGA

8    and -- we will just call them the Freedom Financial entities.

9            MR. ASNEN:  From the Freedom entities.

10           THE COURT:  Yes, can say that no one, or none of the

11   defendants made the call.  Because the allegations, at least,

12   those are what I have to assume to be true, say that, at a

13   minimum, CGA and/or the Freedom Financial defendants, one of

14   them, made the calls, and then there are detailed allegations

15   within the complaint about conversations that Mr. Bank had,

16   albeit on his own initiation when he called back the various

17   numbers, in which a representative of Freedom Financial and

18   also a representative of CGA said that, "Yes, we are

19   affiliated entities."  Freedom Financial even said something

20   to the effect of "We are partners with CGA."

21           Now, they also said things to the effect of, "Yes,

22   you must have gotten a call from," and I think they identified

23   CGA at one point and Freedom Financial at one point.

24           So it is hard for me to understand how you could

25   possibly argue that neither groups of defendants, if you will,

5

1    just to shorthand it, made that call.  Clearly there was a

2    call to be -- that was made, as alleged, and, clearly, it was

3    either CGA or Freedom Financial, or both.  But neither of

4    them, doesn't seem to me, to even be possible.  Do you see

5    what I am saying?

6                MR. ASNEN:  Well, I do understand Your Honor's

7    point, but, respectfully, I would note that if you read some

8    of the detailed allegations of the complaint, it is only

9    through a series of transfers that he ultimately got to speak

10   to the Freedom entity and subsequently the CreditGuard entity.

11               THE COURT:  But wait a second.  That doesn't seem

12   right.  It seems what happens is he got the automated call,

13   and then he pressed "1" before that call finished, and he was

14   transferred to somebody who identified himself as being part

15   of CGA, correct?

16               MR. ASNEN:  I think it might be easier to call them

17   CreditGuard.

18               THE COURT:  No, I'm going with "CGA."

19               I mean, isn't that correct?  The first person,

20   Mr. Wright, says, "Yes, I'm here with CreditGuard of America.

21               MR. ASNEN:  Yes, but I think that takes a factual

22   leap to get from the actual placing of the call to now you are

23   talking to Mr. Wright.  Because some intervening event,

24   pressing the number in response to being prompted by the

25   original recording, is what facilitated the transfer, and then

6

1   was, I guess, a manual transfer subsequent to that that got

2   him to CreditGuard.

3           THE COURT:  So you don't think it is a reasonable

4   inference that when someone gets an automated call that says,

5   "press 1, if you want to follow up," and when that person does

6   it, that someone answers from CGA, that one could infer that

7   CGA had something to do with the original call being

8   initiated, even if they weren't the caller, they certainly

9   were working with the person, the company making the call?

10          MR. ASNEN:  I think now Your Honor is touching upon

11  two separate issues.  Sounds like we're turning towards the

12  vicarious liability for the initiation of the call, and my

13  original point was that the complaint doesn't actually allege

14  that the defendants initiated that call.  So in order to hold

15  any of these defendants liable for that initiation, there

16  would be a factual basis that needs to be alleged to establish

17  this vicarious liability theory.

18          THE COURT:  Okay.  Let's -- if I give you that,

19  hasn't Mr. Bank done that?  Because he then goes on, much more

20  so than other consumers would do, to make a series of phone

21  calls in which he gets representatives from CGA and Freedom

22  Financial on the phone, either separately or even in a

23  conference call, and what they say to him throughout is, "Oh,

24  yes, Freedom Financial and CGA work together," and that if you

25  said something, or you must have said something to them that

1   made it clear to Freedom Financial that you didn't qualify for

2   their services, so, therefore, they would have referred you to

3   us, you don't think that establishes some kind of agency, some

4   sort of ratification or apparent authority?  I mean, I am just

5   stunned, actually, in a way.  Because, admittedly, a lot of

6   these cases do involve what you say are bare bones allegations

7   about a relationship between different companies.

8           This does seem to be different.  And don't get me

9   wrong, I am not necessarily pleased that this is being brought

10  as a class action lawsuit the way it is, and that Mr. Bank,

11  obviously, is famous for, but it does seem to me in this case

12  he's done his legwork or homework to try to shore up that

13  relationship between the two companies and to have them, in

14  essence, either ratify or indicate to him, and he's the

15  relevant party here, that there is some apparent authority by

16  one company or the other to make the phone call initially, or

17  to make that initial phone call on behalf of the other party,

18  admittedly without necessarily knowing which party made the

19  call, but clearly indicating that one of them did it, and the

20  one that did it did so with either apparent authority or

21  ratification of the other.

22          I mean, how do you escape that when you have this

23  level of detail?

24          MR. ASNEN:  Well, again, I would just go back to the

25  fact that there's nothing in this complaint tying the

8

1    defendants to the entity that initiated the call.  So even if

2    you were to assume the truth of the allegations concerning the

3    business relationship between the Freedom entities and

4    CreditGuard, whether or not that rises to an agency principal

5    relationship, I will put that to the side, I think that's

6    separate and apart from the agency relationship that would be

7    necessary between the defendants and the entity that initiated

8    the call, which -- so I -- the way we view this is that there

9    are a few different calls along the way.  There's the original

10    call with the message, and then the subsequent transfers to

11    the call.

12            So I think that it is helpful to take that initial

13    call, which is the subject of the lawsuit and say, okay, who

14    initiated it, was there an agency principal relationship

15    between the entity that placed it and the entities along the

16    chain.  And to my eyes and our position is that there's

17    nothing in the complaint that sets forth that agency

18    relationship sufficient to attach vicarious liability to any

19    of these entities.

20            THE COURT:  So your argument really boils down to

21    that first automated phone call that's made, there's no

22    identification of who made the call, because there's no --

23    although let me -- hold on one second.

24            Is there a caller ID that goes with that first call?

25    There's a number, right, Mr. Bank?

1          MR. BANK:  Yes.  A spoof number.

2          THE COURT:  A spoof number, okay.

3          So based on the caller ID, there's no identification

4   of what party instigated, I will call it, a robo call, right?

5          MR. BANK:  Correct.  That's right.

6          THE COURT:  So, basically, your argument, Mr. Asnen,

7   is that because there's no direct allegation about the

8   identity of the instigator of the automated call, there isn't

9   a reasonable inference based on the subsequent conversations

10  that Mr. Bank had with representatives of CGA and Freedom

11  Financial that would connect them to that initial automated

12  call.

13         MR. ASNEN:  Yes.

14         THE COURT:  Okay.  Let me ask you then, Mr. Bank, it

15  is true that there was an automatic call, and when you pressed

16  "1," you were referred to someone named Ken Wright, a credit

17  advisor with CGA, correct?

18         MR. BANK:  Correct.

19         THE COURT:  Okay.  Then you subsequently called an

20  entirely different number -- or let me go back, actually.

21  Then when you were disconnected with Mr. Wright he called you

22  back from --

23         MR. BANK:  He called me back, and even asked me,

24  without my saying a word, other than maybe "hello," he asked

25  me for the alias I had just given when I received the call.

1    He certainly knew who I was in that regard.

2          THE COURT:  Right.  So there's certainly a

3    connection between Mr. Wright from CGA and the first automated

4    call because he knew the alias you gave of Mr. Larsch,

5    L-a-r-s-c-h --

6          MR. BANK:  Something like that.

7          THE COURT:  -- in response to the automated call,

8    correct?

9          MR. BANK:  Correct.

10         THE COURT:  Okay.  Doesn't that at least connect the

11   initiating call to CGA?

12         MR. ASNEN:  I think it would take an inference

13   that's not spelled out in the complaint.

14         THE COURT:  What more should be spelled out?  He

15   gives an alias, so, therefore, one could assume that this name

16   of Larsch isn't connected to Mr. Bank's phone number,

17   residential phone number, and somehow miraculously Mr. Wright

18   from CGA just guesses that he goes by the alias of Larsch?  I

19   mean, that seems the least probable inference.  The much more

20   likely one, and I don't think that many dots have to be

21   connected, is that Mr. Wright, who actually identified himself

22   in the first call, I think, after the line was transferred to

23   him, with the pressing of "1," then calls back and knows

24   exactly who Mr. Bank claimed he was in that automated -- the

25   call that went from the automated call to the transfer call.

11

1          I mean -- sorry.  Let me back up a little bit.

2          MR. ASNEN:  Can I jump in for a second?

3          THE COURT:  Yes.

4          MR. ASNEN:  What I think is confusing, maybe to all

5     of us, is that from the initial allegations, the early

6     allegations in the complaint, Your Honor's come to the

7     conclusion that you press "1" and you get Mr. Wright.  But the

8     later allegations suggest strongly that it was Freedom that

9     transferred Mr. Bank to CreditGuard.  So there seems to be

10    something lost in translation in the allegations here.

11         THE COURT:  Well, wait.  The only thing that's

12    missing, and you are right about this, that when Mr. Bank

13    presses "1," we don't -- you are saying you don't know who

14    made that automated call, but somehow when he pressed "1," it

15    goes to Ken Wright of CGA, right?

16         MR. ASNEN:  Well, that's not strictly speaking what

17    the complaint says.  It says, spoke to a live operator, and

18    then the live operator puts him on hold, and then eventually

19    he gets to Mr. Wright.

20         THE COURT:  Okay.  But why isn't it fair to assume

21    that the operator then at least is working with Mr. Wright?

22    If not working -- when I ask you --

23         MR. ASNEN:  Certainly alleged.

24         THE COURT:  Sorry.  If not working at CGA with

25    Mr. Wright, working at a company that is working with CGA and

1    Mr. Wright, whether it is Freedom Financial or some other

2    company.  It seems to me there's a connection between the

3    automated call, whoever the operator was, and then CGA,

4    because that chain of events is linked by the transfers,

5    right?

6           MR. ASNEN:  Correct.

7           THE COURT:  Okay.  Why isn't that enough at least to

8    establish that CGA is in some way responsible for the call

9    being initiated, either by giving authority to whoever

10   initiated that call, and then to have that operator transfer

11   the call to CGA, or ratifying it by then accepting the call

12   from Mr. Bank, not from him, but with Mr. Bank, and then

13   proceeding in that fashion.  Either way, CGA is connected to

14   that original automated call, at least for purposes of a

15   reasonable or plausible inference at that point.

16          I mean, you are really trying to dance on the head

17   of a pin to try to separate them in some way that doesn't make

18   any sense, that some random third party, with whom CGA has no

19   relationship, is making --

20          MR. ASNEN:  Well, there's not a principal agency

21   relationship.

22          THE COURT:  But is somehow making calls, automated

23   calls to citizens, and then transferring those citizens when

24   they do as instructed by pressing "1," to CGA, and somehow,

25   some random act of, I don't know if it is called kindness or

1    referral or something like that, the more reasonable

2    inference, you would say, is that there's no connection, or

3    that he hasn't alleged enough, at least as to connect CGA to

4    that automated call, that's what you are saying.

5           MR. ASNEN:  That's our position, that the complaint

6    hasn't met the minimum pleading standards to allege that kind

7    of a principal agent relationship sufficient to establish this

8    vicarious liability.  But I think that at this point, this

9    might be a good segue to talk about that notwithstanding

10   vicarious liability, because it sounds like Your Honor is

11   inclined to say that the complaint meets that threshold.

12   Notwithstanding that, if the conclusion is that this call was

13   placed on behalf of CreditGuard, then the call itself is

14   inoculated from TCPA liability by virtue of the nonprofit

15   exemption.

16          THE COURT:  Right.  Okay.  Then we should talk about

17   the conversations that ensue thereafter in which -- and,

18   again, the standard here is a plausible inference, and in

19   those conversations, representatives of Freedom Financial and

20   CGA both say that they work together, that they -- that CGA is

21   an affiliate and a partner of Freedom Financial, and that when

22   things don't qualify for purposes of Freedom Financial's work

23   or assistance, Freedom Financial refers them to CGA.

24          I think, I mean, under the dual purpose standard, I

25   think they -- CGA, at least at this stage, can't really rest

1  on this immunity under -- or exception under the TCPA.  Again,

2  at the pleading stage, there seems to be a very close

3  relationship established in not one, not two, but it seems

4  like three different calls with representatives of both

5  defendants' companies.

6          So, again, I just don't see how you avoid both the

7  agency inference as well as the dual purpose inference, when,

8  in fact, they are both saying, when it doesn't work for

9  Financial Federal (sic.), they send the caller to CGA.  At

10  that point, certainly CGA seems to be acknowledging that

11  Federal Financial is making these dual purpose calls on its

12  behalf.  Either it is going to be a commercial call that

13  Federal Financial will handle, or it is going to be a referral

14  to CGA, for those who don't qualify.

15          Once they sort of align themselves or link

16  themselves to Federal Financial, I don't think, at this stage

17  at least, they can hide behind this exemption for nonprofits.

18          MR. ASNEN:  Well, with respect to -- I think that

19  the FCC has never actually applied this dual purpose standard

20  to the nonprofit exemption.  The dual purpose call standards

21  have come when calls are mixed with informational purposes and

22  telemarketing purposes.  It's never been extended by the FCC

23  to calls placed by or on behalf of nonprofit exemptions.

24          The language of the exemption itself is pretty

25  unambiguous that calls placed by or on behalf of the

1    nonprofit, taxed as a nonprofit corporation, are exempted from

2    liability.  You need to read additional context in order to

3    get outside of that rule.  But I don't know if that's

4    necessarily appropriate here, because either the call was

5    placed on behalf of CreditGuard or it wasn't.

6              THE COURT:  But here's the thing.  I don't think it

7    takes much to read into these set of facts some possible

8    applicability of this exemption.  Because here's what we have.

9    We have an automated call that's made by some party, that when

10   "1" is pressed, it goes to an operator, either CGA's or

11   Federal Financial's, or some other parties, but then the call

12   ends up being referred to CGA, right?  And so the question is,

13   is that initial call, which says something to the effect of,

14   you know, we can help you with your consumer services, that

15   call is a commercial call by nature.  But then the question --

16   or then the decision tree that if he says, as Mr. Bank did, "I

17   only have $14,000," or "I have $14,000 in credit card debt,"

18   he's shunted in one direction versus another.

19              Again, if, as I found, or will find, there's at

20   least some agency relationship between CGA and the party

21   making the call, which seems to me based on the other

22   conversations that Mr. Bank has, was probably Freedom

23   Financial, if that initial call had a partially commercial

24   component, which it did, because, again, there was a decision

25   tree, if "X," you go to Federal Financial, if "Y," you go to

1    CGA, then it seems to me CGA shouldn't be able to avail itself

2    of the exemption under the TCPA.  Because, in effect, they are

3    hiding behind this Federal Financial company in some way to

4    have them be the stalking horse, if you will, but, clearly,

5    the initial contact, there's no question, was commercial in

6    nature.

7            MR. ASNEN:  If I may, Your Honor.

8            THE COURT:  Yes.

9            MR. ASNEN:  The nonprofit exemption is not limited

10   to noncommercial calls.  It is limited to calls placed by or

11   on behalf of tax exempt organizations.  They can be

12   commercial.  I think that Your Honor might be misinterpreting

13   the rule.  I would refer you to the *Henry* case that we cited

14   in our brief, which I think is somewhat on point.  Those calls

15   at issue were commercial in nature.  The dialer, in fact,

16   was -- they got a direct benefit out of the calls that were

17   being placed.  But they were being placed on behalf of a tax

18   exempt organization, and the Court found that the nonprofit

19   exemption applied to exempt the call from liability.

20           THE COURT:  So let me make sure I am certain of what

21   you are talking about.  The FCC language is essentially dual

22   purpose, means a call that -- with a customer, that is both

23   informational or has an informational component, as well as a

24   marketing component.  And the FCC said back in 2003, those are

25   prohibited, right?

1    MR. ASNEN:  Correct.  Well, they are not -- right.

2    They are not -- they don't get the benefit of the exemption.

3    THE COURT:  Okay.  And though you're arguing that --

4    MR. ASNEN:  Or that whatever applicable exemption

5    wasn't directed towards the nonprofit exemption.

6    THE COURT:  Okay.  But so isn't it true that if

7    there was a marketing component to this initial call to

8    Mr. Bank, that that would meet the dual purpose definition, at

9    a minimum, assuming that there's then also an informational

10   component?

11   MR. ASNEN:  Well, I would respectfully disagree.

12   Counsel cited to the *Aranda v. Caribbean Cruise Line* case in

13   his opposition for the proposition that the nonprofit

14   exemption would not apply here.  And you can see, as the court

15   analyzes that issue, it correctly notes that the FCC has

16   determined that calls placed by or on behalf of tax exempt

17   nonprofit organizations are not telephone solicitations for

18   purposes of the TCPA.

19   THE COURT:  If there's no marketing component?

20   MR. ASNEN:  If they're placed by or on behalf of a

21   nonprofit.  Those calls are allowed to market their goods and

22   services of tax exempt organizations.  So where there might

23   otherwise be advertisements, solicitations, telemarketing, the

24   FCC said if they are done on behalf of a tax exempt

25   organization, they are not telephone solicitation.

1      THE COURT:  So you're saying if all that happens is

2  CGA is marketing its own services as a nonprofit, that

3  wouldn't run afoul of the --

4      MR. ASNEN:  I think that's pretty clear.

5      THE COURT:  But if they market the services of

6  another organization, such as federal -- sorry, Freedom

7  Financial, that would run afoul of the rule?

8      MR. ASNEN:  No, I would take the position that they

9  are placed by a tax exempt organization.

10     THE COURT:  So anything a tax exempt organization

11  does is fine?

12     MR. ASNEN:  By the letter of the regulation, yes.

13  Within the context of the TCPA, of course.

14     THE COURT:  Mr. Bank, do you want to respond to

15  that?

16     MR. BANK:  Sure.  First, in *Aranda*, which is

17  discussed on page 22 of the brief that deals with the TCPA

18  claims, the court dealt with both for profit entities and tax

19  exempt nonprofits, and it declined to dismiss the claims

20  against all of them.  The dual purpose rule, the concept is

21  that if a call is partly legal, slash, exempt, and partly

22  illegal, slash, nonexempt, the call is not exempt.  So Your

23  Honor's stated that -- or indicated that CGA is sort of hiding

24  behind Freedom Financial.  That's exactly what it's trying to

25  do here.

19

1          THE COURT:  But, again, what we're quibbling about,

2     though, is what does it mean to be exempt.  According to

3     Mr. Asnen, the case law, despite what it says in the 2003 FCC

4     report, it is fine for CGA to advertise or market its own

5     services, and, also, it seems to market the services of

6     Freedom Financial.

7          MR. BANK:  Well, the former --

8          THE COURT:  That's what I'm saying.

9          MR. BANK:  -- I think might be true.  Let's say CGA

10    is a non -- a tax exempt organization, and it wants to raise

11    money for the organization.  They sell magazines.  Okay.  That

12    would seem to me to be exempt.  So you get a robo call, "Press

13    '1' if you'd like to get US News and World Report for 20

14    dollars a year."

15         But in this case, they have gone beyond that.  In

16    this case they are acting in part or jointly with Freedom

17    Financial.  So let's say, again, for --

18         THE COURT:  To do what?  To market Freedom

19    Financial's commercial services?

20         MR. BANK:  Correct.

21         THE COURT:  Okay.  And that you would say, contrary

22    to what opposing counsel is saying, would violate the FCC

23    rule?

24         MR. BANK:  Correct.  When the FCC uses the term

25    "buyer on behalf of a nonprofit," it means that the nonprofit,

1    as I understand it, is the, and only "the," ultimate potential

2    or hoped for beneficiary.  If an ordinary company, if IBM

3    wants to sell computers, for lack of a more modern example, I

4    guess, and they hire the Red Cross to make telemarketing

5    calls, the Red Cross being, I assume, a nonprofit, that's not

6    the kind of exemption being spoken of.  In fact, if it were

7    the opposite, if the Red Cross hired IBM to make calls for the

8    Red Cross, that would be exempt, it would seem to be exempt,

9    as against all those -- both of those entities, both IBM and

10   Red Cross.  But, here, and like in my other hypothetical, we

11   are dealing with the opposite situation in which a nonprofit

12   makes calls for the ultimate beneficiary, a for profit.

13   That's not the kind of thing the FCC was speaking of at all.

14           THE COURT:  Here's a question, though.  What in your

15   complaint, though, gives rise to that inference?  In other

16   words, right now what you have is an anonymous automated call.

17   When you pressed "1," you were sent to an operator, again,

18   without any indication of who that operator worked for.  Then

19   you eventually were transferred to CGA, and that person you

20   spoke to briefly, you were disconnected, the CGA person called

21   you back, and assume for the moment they tried to market their

22   own services, we can help you or something like that.

23           None of that on its face would be contrary to its

24   tax exempt status or its -- sorry, non -- sorry, nonprofit

25   status, correct?

1     MR. BANK:  I think so far, so good, yes.

2     THE COURT:  But you're making the further allegation

3   that they are really a stalking horse in some way for the

4   federal -- Freedom Financial group, and that they are

5   really -- they made the call for Freedom Financial.  Where

6   does that come from, with respect to your call?  Because even

7   assuming, as I must, that there are all these conversations

8   where everyone acknowledged that they had this agency

9   relationship, or I will call it that for shorthand, or a close

10  working relationship, where's the evidence, though, that in

11  this instance, as to you, the call was made by CGA on behalf

12  of Freedom Financial?

13    MR. BANK:  Well, I don't allege -- I don't know who

14  made the call, and we talk about -- I talk about, I should

15  say, not "we," I talk about in the brief, and this also goes

16  with the -- I have the case here.  It is in point 2, I think

17  it is in point 2 of the brief dealing with the TCPA claims,

18  which is that -- and the FCC talked about it as well, a

19  consumer or recipient of one of these robo calls is not

20  ordinarily expected to be able to identify the party that made

21  the call, and in this case, how could I?  The caller ID was

22  spoofed, which I allege was deliberately done so that I

23  wouldn't be able to know who's calling.  And they are all

24  spoofed these days.  Most of the calls I get, if it has my

25  area code and prefix and I don't recognize it, it's a robo

1    call.  Nine out of ten, at least.

2         So to go back to the question, as the complaint

3    describes, CGA's position is this.  If you qualify, based on

4    the amount of debt you have, or something like that, for our

5    services, we will try to market our services to you.  If you

6    do not qualify, meaning that your debt is either above or

7    below whatever the cutoff was, we will then refer you to or

8    back to Freedom Financial.  So to that extent -- and, again,

9    and vice versa, if you talk with Freedom Financial, and you

10   say, "I have 'X' amount in debt, in credit card debt," and it

11   doesn't meet or exceed their threshold, Freedom Financial will

12   then shuttle you over to CGA.  Again, vice versa.

13        THE COURT:  But the problem you have is that your

14   allegations don't actually show that that goes two ways.  In

15   other words, what you really have is, you have what reasonably

16   or best can be inferred to be a call from CGA, or even Freedom

17   Financial, but then they sent you to CGA, but you don't have

18   any allegations that show that CGA was, as you just said,

19   referring or marketing the services of Freedom Financial,

20   because even your statements with these various people who

21   work for both groups simply say, when Freedom Financial

22   determines that they cannot help you, they'll refer the

23   consumer to CGA.  But it doesn't say the opposite.  It doesn't

24   say CGA operates as a marketer in some way, or a referrer for

25   Freedom Financial.  And isn't that important in terms of the

23

1    exemption for CGA?  I mean, people can refer, commercial

2    entities --

3              MR. BANK:  Of course.

4              THE COURT:  -- can refer them all day, and even

5    market for them, and send them calls.  That's fine, right?

6    That doesn't violate --

7              MR. BANK:  Yes, I think so.

8              THE COURT:  Right.  But CGA cannot, you would argue,

9    without violating this dual purpose ruling.

10             MR. BANK:  Correct.  Correct.

11             THE COURT:  But what evidence do you have that CGA

12   was doing that?

13             MR. BANK:  I think -- well, I think there's an

14   inference, which certainly should be allowed to be pursued in

15   discovery, which is if I -- if Freedom Financial says -- I

16   think the cutoff is, I think, $15,000, and then there was a

17   little wrinkle because I met -- I forget, you know, exactly

18   all the differences, but I actually met the criteria, again, I

19   made it all up, just like the alias, to be sure, just took a

20   stab in the dark at the 14,000, and I think 15,000, or maybe

21   7,500, whatever it was, there was some cutoff.  So I got --

22   they say, "We'll refer you then to this one."  If I had been

23   talking --

24             THE COURT:  The "they" being who?

25             MR. BANK:  Freedom Financial to CGA.  Now, if I said

24

1   to CGA, "Oh, I made a mistake, I didn't know -- my debt is not

2   14,000, it is only 7,000," for example, I think an inference

3   can be drawn that they would say, "Well, then you need to deal

4   with -- then we will refer you or you need to deal with

5   Freedom Financial.  But, again --

6          THE COURT:  But you're just guessing.  That didn't

7   happen here.

8          MR. BANK:  Well, I think it is a reasonable

9   inference that that's how it would work.  Because they do say

10  they work together, they operate jointly.

11         THE COURT:  No, but what they keep saying to you is

12  when Freedom Financial finds people who don't meet their

13  criteria, and that's said consistently, they refer, meaning

14  Freedom Financial, refers the customer to CGA.  But there's

15  nothing in your allegation that suggests that CGA does the

16  reverse, which is critical for them losing their exempt

17  status.

18         MR. BANK:  Well, I guess my response would be, in

19  addition to what I said a moment ago, that I think it is still

20  a reasonable inference, but, if not, it is certainly

21  something -- obviously, it is something, as a practical

22  matter, let's say, let's say I had only been suing Freedom

23  Financial and not CGA, and I inquired -- I would still inquire

24  about that, and then I would just add CGA, if, in fact, I am

25  told that CGA, in the event that it turned out that I only

1    qualified for Freedom Financial, that CGA would then refer me

2    back in some way to Freedom Financial.

3            THE COURT:  Well, that may turn out to be true, but

4    right now you have no basis for alleging that.

5            MR. BANK:  Well, again, I think it is a fair

6    inference when two companies both say during the conference

7    call no less, that we work together, and that if we can't

8    service you based on the amount of debt that you say you have,

9    A, we'll refer you to B, A being Freedom Financial, B, CGA,

10   that there's no reason for them to tell me that, but if it

11   turned out because they assumed that if I said $14,000 was my

12   debt, that that would be it.

13           But if it turned out, "Oh, I made a mistake, I just

14   paid half that debt last week, my wife paid it, whatever, my

15   debt is now 6,500," I think it is a reasonable inference that

16   they wouldn't just hang the phone up on me, and say, "I'm

17   sorry, there's nothing we can do, have a nice day," but who

18   knows.  Anything is possible.

19           THE COURT:  This is sort of like your other

20   allegation where you say, "Had I not pressed '1,' I assume

21   that the following would have happened."

22           That's not how you begin a lawsuit, with assumptions

23   about what would happen.  Truthfully, if you wanted to create

24   that situation, perhaps you should have changed your number

25   somewhere in the conversation and said, "Hey, in fact, my debt

1   is more than that."

2           And if that had happened, fine, I would be willing

3   to say that's certainly a substantiated inference to be made.

4   But right now you are just guessing.  The truth is, it is also

5   a plausible inference that CGA, mindful of its status as a

6   nonprofit, doesn't do what you're saying, because they don't

7   want to run afoul of the dual purpose rule that exists.

8           So I can't just take a guess that that would happen.

9   You have no basis for assuming that CGA would have referred

10  you back to Freedom Financial.  What you do clearly have is

11  that Freedom Financial does refer people to CGA, but there's

12  nothing wrong with that.

13          And, in fact, if Freedom Financial, let's assume,

14  made the initial robo call, and when you pressed "1" and gave

15  the answers that you did, and they referred you to CGA,

16  there's nothing wrong with that either, right?

17          MR. BANK:  That's fair.  I think that's right.

18          THE COURT:  So, I mean, I think you have a problem,

19  and I'm not saying that what you suspect might be happening

20  wouldn't be bad, or isn't actually happening, but you don't

21  have enough factual allegations, I don't believe, right now,

22  to pierce CGA's nonprofit status and accuse it even of a dual

23  purpose -- or of dual purpose activity on behalf of Freedom

24  Financial.  That's where I think you are stuck at the moment.

25          MR. BANK:  Well, that goes back to a separate issue.

1  Let's say for the sake of discussion that CGA does not refer

2  people to Freedom Financial.  But, again, we still have a dual

3  purpose scenario because we have a call that in one respect is

4  legal, to the extent that it is intended to or possibly

5  intended to make CGA the ultimate beneficiary of the call, we

6  have one aspect that's not legal, which is with Freedom

7  Financial.

8          So I don't know why -- I don't see any indication or

9  understand why would the FCC -- and this is what *Aranda* dealt

10  with, when *Aranda* declined to dismiss the nonprofits.

11          THE COURT:  Here's what I hear you saying.  Hang on

12  one second.  It seems to me, and you were maybe too quick to

13  agree with me, is if what happened here and what can

14  reasonably infer happened here, is that if Freedom Financial

15  is the one that initiated the automated call, and then

16  referred you to CGA once you gave your response -- although

17  let me ask you a question.  Did you say you had $14,000 worth

18  of debt to the operator?

19          MR. BANK:  Yes.  The first live person asked you the

20  typical series of questions, and that's why I first mentioned

21  that figure.

22          THE COURT:  And that's when you get sent to CGA?

23          MR. BANK:  Correct.

24          THE COURT:  So, if anything, there may be a

25  reasonable inference that Freedom Financial was the first --

1    initiated the robo call, because of the subsequent

2    conversations that you had, which said, "We work with them,

3    and when they get someone like you who has only $14,000 in

4    debt, they refer you to us."  That would reinforce some

5    inference that it was Freedom Financial that made the first

6    robo call, and then it was their operator who referred you to

7    Ken Wright of CGA.  That's ultimately what your claim could

8    be --

9              MR. BANK:  Right.

10             THE COURT:  -- it seems to me.  But that would take

11   CGA out of the case, in a sense, unless -- well, no, there's

12   no "unless," actually.  Because CGA could have Freedom

13   Financial do this on their behalf.  There would be nothing

14   wrong with it since they are tax exempt, right?

15             MR. BANK:  Well, here's the problem.  It wasn't --

16             THE COURT:  Not tax exempt, I'm sorry.  Nonprofit.

17             MR. BANK:  Right.  I understand.

18             But here again it goes back to what is a dual

19   purpose call.  The initial call -- they make initial calls.

20   They don't know what my debt is, what I am going to claim, as

21   it were, my debt is.  So when the initial call is made, they

22   are saying, well, let's see how it goes, we might send this

23   person to Freedom Financial, or we might send the person to

24   CGA.

25             So insofar as the call might -- is intended, 50/50,

29

1   let's call it, okay, to benefit Freedom Financial, that's

2   unlawful.  I don't think that's in dispute, Freedom

3   Financial's a for profit entity.

4          And so the dual purpose, all the dual -- yes, they

5   don't -- the FCC's examples, they were just hypotheticals,

6   don't deal with nonprofit and a for profit, but they deal with

7   a call -- each of the examples deals with different types of

8   calls that were partly lawful, that standing alone this would

9   be a lawful or exempt call, and partly, not fully, but partly

10  unlawful or nonexempt, and the FCC said in each of those

11  cases, the call -- I'm sorry, in each of those cases, the call

12  itself, a hundred percent, not 50/50, the bad 50, I will call

13  it, the bad 50 percent negates the entire call, makes the

14  entire call unlawful.

15         THE COURT:  I understand what your argument is.  In

16  other words, you actually have to have -- there was some

17  argument about apparent authority to let Freedom Financial

18  make a dual purpose call on their behalf or ratification of

19  that dual purpose call after the fact.

20         MR. BANK:  Right.  Which certainly happened here.

21  They were both trying to get my business at various points.

22         THE COURT:  I suspect the problem, though, is when

23  Freedom Financial makes the call, though, there's nothing dual

24  purpose about it that's illegal as to them.

25         MR. BANK:  As to who's "them"?

1          THE COURT:  Sorry.  Well, no, no, I take that back,

2    actually.  I guess -- that's right.  I guess the automated

3    call of itself, you would say, is illegal as to Freedom

4    Financial, because they shouldn't be making automated calls.

5          MR. BANK:  Correct.  I should say automated calls

6    shouldn't be made by whomever it is, with Freedom Financial

7    being one of, let's say in this case, two potential ultimate

8    beneficiaries.

9          THE COURT:  Right.  That's right.  And I guess CGA

10   should not be making those calls as well, but only if it

11   doesn't have the ability to claim this nonprofit exemption.

12   And the reason they can't is because they're either giving

13   authority to Freedom Financial to do it for them, to make

14   these dual purpose calls, or ratifying these dual purpose

15   calls.

16         MR. BANK:  I think that makes sense to me.

17         THE COURT:  Yeah.

18         MR. ASNEN:  I think it is important to note that the

19   dual purpose doctrine has never been applied by the FCC to the

20   nonprofit exemption.  And while *Aranda* did pay lip service to

21   this, in doing so, they're the only court that did it.  I

22   think it's important that no court has followed suit, and I

23   think the Court should show some restraint in not following

24   suit.  Because it is our position that *Aranda* got it wrong.

25   The nonprofit exemption language is clear.  Calls placed by or

1  on behalf of tax exempt nonprofits are exempt from TCPA

2  liability, and the FCC has never issued any guidance otherwise

3  with respect to this exemption.

4      This particular regulation has never been challenged

5  under the Hobbs Act, the language is unambiguous, and I think

6  that it should be enforced as such.

7      THE COURT:  But what you are arguing for is a matter

8  of policy, really, seems wrong, which is that so long as a

9  company sets itself up as a nonprofit, they can do whatever

10  they want.  They could solicit business for -- or they can

11  violate the automated call rule, that's what you would say,

12  right?

13      MR. ASNEN:  Well, I think along the lines of showing

14  restraint, it is not totally necessary to play hypotheticals

15  when we have an actual call that happened here, that I think

16  that the nonprofit exemption applies to.

17      THE COURT:  Well, right.  But, I mean, I guess let's

18  take this situation.  If the allegations are accepted as true,

19  they suggest that -- or they reasonably suggest that CGA is

20  basically working with Freedom Financial to make these calls

21  to market services of either Freedom Financial or CGA,

22  whatever the circumstances are, and that they are then

23  skirting, because they have this exempt status, the regulation

24  that would prevent them from making automated calls, and they

25  shouldn't be held liable, but Freedom Financial should be, is

1    essentially what you are arguing.

2         MR. ASNEN:  It is our position that the exemption

3    applies to the call, not to the party, specifically.

4         THE COURT:  But for the moment, assume that I think

5    there's some showing of agency here.  And if that's true,

6    you're still, as your fallback, I think, arguing that no

7    matter what, CGA, as a nonprofit, should not be held

8    responsible for potential violations of the TCPA.  Because it

9    is their status.

10        MR. ASNEN:  Well, I mean, I would, I guess, take

11   issue with the way that was phrased, but the point is fair, I

12   think that the exemption takes this call outside the scope of

13   a violation.  It is, per se, not -- it is placed by or on

14   behalf of the tax exempt organization.  It wouldn't be a

15   violation.

16        THE COURT:  Okay.  But I guess the problem I am

17   having is, A, the FCC did say that there was this doctrine of

18   dual purpose.  The fact that it hasn't been applied in any

19   case, I don't know how compelling that is.  Obviously, all the

20   cases are very fact specific.  But if I find that there's a

21   reasonable inference that CGA either gave authority to or

22   ratified the actions of Freedom Financial to make this

23   marketing call on its behalf, as well as on behalf of Freedom

24   Financial, so, therefore, a dual purpose call, that CGA should

25   still not be -- should still be exempted from the TCPA because

33

1    of its status.  That's what you're arguing, or that's

2    certainly the logical --

3           MR. ASNEN:  Alternative argument, sure.  At the very

4    least, CGA should get the benefit of this exemption, if not

5    for the call, at large.

6           THE COURT:  But even if they are in some way

7    skirting the -- well, even if they are using their status to

8    benefit a commercial entity that would be barred from doing

9    the conduct that they're accused of, they should still -- CGA

10   should still get the benefit of the exemption.

11          MR. ASNEN:  Yes.  And I -- to that point, I refer to

12   the *Wengle* case that we cited in our initial brief, where I

13   think it is somewhat analogous to what happened here, where a

14   for profit entity was placing the calls on behalf of a

15   nonprofit, it was soliciting purchases of magazine

16   subscriptions, and ultimately took the vast majority of that

17   revenue from the purchase, but the nonprofit was also getting

18   the benefit of direct donations that were placed on that phone

19   call.

20          So notwithstanding that there was a benefit to the

21   for profit dialer that was attendant to the phone call placed

22   on behalf of the tax exempt organization, the court found the

23   nonprofit exemption applied, and that that call was not

24   subject to TCPA liability.

25          THE COURT:  Okay.  All right.  Let's turn now to the

34

1    business law violation.

2            Let me turn to you, Mr. Bank, because I think you

3    are going to have a difficult time establishing standing for

4    this one.  The question for you is, what injury, if any, can

5    you point to, because I certainly don't include all the time

6    you spent trying to figure out who was calling you to count,

7    given that the purpose of the statute is to prevent people's

8    phones from literally being taking captive by robo calling,

9    whereas here, to the extent that your phone was in use by

10   virtue of the robo call, that was brief, and the other 20

11   minutes or so was your actual efforts to go figure out who was

12   calling you so you could file a lawsuit.  That really isn't

13   what the statute was meant to protect.

14           So how is it that you have -- what's your injury

15   here?  And go ahead.

16           MR. BANK:  Certainly.

17           As far as the idea about not tying up people's phone

18   lines, that deals with the five second rule, which is that

19   when an automated call is made, it must be disconnected within

20   five seconds.  That's not my claim.

21           THE COURT:  Right.

22           MR. BANK:  My claim is that the disclosure

23   requirements, which were obviously intended, and the

24   legislative history, which I don't think should matter, but it

25   does mention it, for what it's worth, was intended to -- it

1  was intended to enable someone to know who's calling so they

2  can communicate -- obviously, it's meant to communicate with

3  the caller.  Obviously, when the statute says, you must

4  provide a name, the nature of the call, an address and a phone

5  number, that has nothing to do with tying up a phone line.

6            THE COURT:  But here you pressed the button, so you

7  can't say that at the conclusion of the call, you wouldn't

8  have gotten the rest of the information.  Because you did get

9  a name, right, to start?

10           MR. BANK:  Some of the information has to be

11  provided at the beginning of the call, and some at the end.  I

12  got a first name, with no fake -- what I think is a fake

13  generic first name of Jennifer, with no last name, combine

14  that with a fake caller ID, and the message itself did not, at

15  the beginning, like it is supposed to, have -- I forget which

16  is supposed to be the beginning and at the end, but the

17  address and/or phone numbers at the beginning, something else

18  at the end.  The point is, though, I allege, and these are the

19  factual allegations, that the message, A, never provided any

20  of the required contact information, the address, the phone

21  number, an actual real name --

22           THE COURT:  But that you can't say, because you

23  never listened to the whole call.

24           MR. BANK:  Well, there's two things.  One, as I

25  state in our brief -- I keep saying "our," but there's only

1  one person here.  What I keep stating in my -- which I did

2  state, rather, in my brief, which is that I was able to find a

3  transcript of that exact same message, online, number one.

4         Number two, to the extent that any entities have any

5  bearing here, I think it would be, really, absurd, that the

6  defendant says, if you want to speak to someone, in my case,

7  yes, I wanted to know who I might sue.  I want to know who's

8  making these illegal calls, press "1" on the phone.  I'm sort

9  of like, if I may, pardon my French, damned if I do, damned if

10 I don't.  Because if I don't press "1," I never get to speak

11 to someone, and all I have is a generic recording, named

12 Jennifer, which is not that helpful.  I can't really call the

13 operator and say, "Please connect me with Jennifer."  I have a

14 fake caller ID number.  And so now that I did press "1," now I

15 am being told, "Well, you shouldn't have done that, because

16 now you didn't listen to the rest of the message."  Well, if I

17 didn't press "1," I might have heard the rest of the message,

18 but then I wouldn't have known who called or had anything to

19 do with it.

20        THE COURT:  Whoa.

21        MR. BANK:  Going too fast.

22        THE COURT:  Way too fast.

23        MR. BANK:  Way too fast.  I agree.

24        But that's the gist of it.  But, again, the

25 allegation, it is entirely plausible, like I said in my brief,

1  that at some other time, I did access the entire message,

2  which I actually did.  In fact, you can probably Google it

3  yourself and it would come up as well.  And, again, consist --

4  I didn't allege this, nor did I have to.  I might have gotten

5  the same call ten minutes later and listened to the whole

6  message without pressing a key on my phone.  That didn't

7  happen, as I recall.  But I am just making the point that

8  there's nothing necessarily inconsistent, and that's what

9  we're talking about here.  Nothing necessarily inconsistent

10  with my having pressed "1" and, therefore, missed the last oh

11  so many seconds of the message, and my saying that that

12  message, had it been played in full, because I have other

13  evidence, would not or did not, either way, contain the

14  required disclosures.

15         Obviously, anything is possible, but it is -- no

16  inconsistency.  The fact that I could turn out to be wrong

17  doesn't mean that the complaint says that I am going to turn

18  out to be wrong, and I am sure that it wouldn't.  As a

19  practical matter, I've actually gotten hundreds of messages

20  exactly like this one for the lowering your credit card rates.

21  Maybe the actual verbiage is a little bit different in each

22  message.  I've never gotten, never, in hundreds of calls,

23  never gotten any of the type of information that was again not

24  disclosed in this message.  But the point is, there's no

25  inconsistency between what I allege and the complaint.

38

1          THE COURT:  That's actually not the point.  The

2    question is, can you rely on -- A, you can't rely on your own

3    personal experience with hundreds of calls and make an

4    assumption, for purposes of this case, that the call didn't

5    contain all the necessary information.  The question, though,

6    is whether or not, based on what you say you found online of

7    the same exact call, from the same exact company, I assume you

8    are saying?

9          MR. BANK:  I don't know -- I don't know.  I don't

10   know who made this call, so I don't know who made the call,

11   but I know that the text of the two calls, the one I received

12   and the one I read online were 100 percent identical, even

13   down to the name Jennifer.  Again, common name, to be sure.

14         THE COURT:  And that call, it didn't contain the

15   required information under the statute.

16         MR. BANK:  Correct.  And I think another way to look

17   at this is that given -- I was told that I had to press "1" to

18   speak to anybody, and that I followed the directions, I think

19   it would be fair to say, given that I didn't press "1"

20   prematurely, I did it upon being told to do so, that that's

21   when the message ended.  The fact that the message would

22   have -- might have, I don't even know if it would have, it

23   might have disconnected the call at that point.  I have no

24   idea.

25              But I followed the instructions, essentially, by

1   saying, press "1" to speak to someone, it is like saying press
2   "1" to end this message.
3           MR. ASNEN:  That's not what they say.
4           THE COURT:  Hold on.
5           MR. BANK:  When I pressed "1," the defendant -- the
6   caller, I should say, the caller could have, certainly could
7   have played through the rest of the message.  They could have
8   continued it, and then transferred me, but they cut the
9   message off.  So they said, to speak to someone, or if you
10  want to look at it a different way, to stop this message,
11  press "1," and I did.  I didn't force the defendant to stop
12  playing the rest of the message.
13          THE COURT:  But let's go back for a minute to the
14  question, though, about injury, though.  So what injury did
15  you suffer?  You still need some basic injury.
16          MR. BANK:  Absolutely.  Yes.  But just by the very
17  nature of the violations, obviously, the purpose is to enable
18  someone either, A, to contact the caller or the party on whose
19  behalf the call is made, or, to make it easier to do so than
20  it otherwise would be.  It is the risk --
21          THE COURT:  But you did that.  You pressed "1," and
22  then you spoke to somebody.
23          MR. BANK:  That's correct.  But I didn't have -- I
24  was still having limited information.  I don't know -- I still
25  don't -- maybe some other party made the call.  I shouldn't

40

1    have had to press "1" and wait --

2              THE COURT:  Then how were you injured?

3              MR. BANK:  Because the message itself, I should have

4    been able to hang up the phone at the end of the message or

5    when I pressed "1," and I understand what you are saying, I

6    think.  And I should have been able to get -- I should have

7    had more information.  I never got an address.  I might have

8    had -- I was supposed to get an address.  I might have written

9    a letter.  I'm not saying I would have.  But it's the risk,

10   and this is what we talk about in *Spokeo* in the brief, or in

11   the one brief, it is the risk of harm.  And that's why in the

12   two disclosure cases, the *Adkins* case and *Public Citizen*, if I

13   remember correctly, it wasn't --

14             THE COURT:  About voting issues.

15             MR. BANK:  Yes.  And the court never said, "Well, we

16   have to know what, if anything, the would be recipient of the

17   information would have done with it."  They said, the mere

18   fact of the nondisclosure is enough.  Look at the *Havens*

19   *Realty*, when it was -- dealt with racial discrimination.  They

20   said that a person who was falsely told that because of his

21   skin color or his race that there were no houses available,

22   that person didn't even have to want to buy a house.  So there

23   was no injury, he wasn't going to buy a house at all.  They

24   even said, on top of it, that even if he expected them to lie

25   to him about a lack of housing, he still would have standing.

1           So here's a person that says, "I went to a real

2    estate office, I -- to ask them what houses are in the area.

3    I had no interest in even obtaining a house.  I also had every

4    expectation that they would lie to me."  And that person had

5    standing.

6           So, here -- again, the risk of harm.  The fact that

7    I ended up speaking to someone, that that's fine, as far as it

8    goes, but in playing the message to me, and in not making the

9    required disclosures, did the defendant create a risk, not

10   actual harm, a risk of actual harm, though.  The answer is

11   clearly yes.

12          THE COURT:  A risk of harm of what, though?

13          MR. BANK:  The risk was that I would be unable to --

14   if I hadn't pressed "1" -- they don't know if I am going to

15   press "1."  In not making the disclosures, the defendant is

16   taking the risk that a person who doesn't press "1," they

17   didn't know what I would do ahead of time, I didn't know what

18   I would do ahead of time, would not be able to contact them,

19   would not do so very easily.

20          THE COURT:  And so?

21          MR. BANK:  That's all I need for standing.  The

22   risk.

23          THE COURT:  No.  That really isn't.  I mean, the

24   cases that you cite stand for a fairly narrow position, that

25   there has been determined to be a generalized public good

42

1    achieved by informing voters of certain issues.  This is not

2    that.  This is a credit card management company reaches out to

3    you, and, in theory, maybe offers to help you with your credit

4    card debt.  That you can't call them back because maybe they

5    didn't give you all the requisite information, or when you

6    pressed "1," somehow you thought that was deficient, even

7    though you spoke to a person, isn't really in the same

8    category, such that it should confer on you standing without

9    some greater showing of injury.

10          I don't think that those two risks of injury, if you

11   want to call it, or actual injury, are really comparable.

12          MR. BANK:  I understand.  If I may say this.  The

13   statute, the GBL statute, has nothing to do with the specific

14   type of call.  It doesn't care whether it is a credit card

15   call or selling aluminum siding or anything else.  The

16   question is -- but I think we would -- I hope we would agree,

17   that the statute is clearly intended to enable a recipient of

18   a call to contact, after the call, to contact either the

19   caller or the entity who's behind the call.

20          THE COURT:  Well, this is, though, I think where we

21   get back to what was the purpose of the statute.  And it seems

22   to be, based on the legislative history, that the primary

23   purpose was to prevent people's phones from being tied up from

24   these solicitations where there wasn't an automatic hang up.

25          That seemed to be the primary focus.  So I don't

43

1    actually think, if you are going to argue what the statute was

2    concerned with, it actually isn't so much about being able to

3    contact that solicitor, that you didn't want calling you in

4    the first place and tying up your phone.

5            So, I mean, I think you're barking up the wrong tree

6    in that regard.  I do think you are going to have a problem

7    with standing, because you really are alleging a bare

8    violation of the statutory language.

9            MR. BANK:  Well, if I may address it.  Like I said,

10   I don't think the legislative history, which is now in New

11   York legislative history, but neither here nor there, I don't

12   think -- I'll put it this way.  If the legislative -- first of

13   all, the provision that I am suing under has nothing to do

14   with the availability of your telephone line.  The rationale

15   for the provisions that I am suing under, I don't think they

16   can be any more clear.  You must give telephone number and

17   address of the caller, and so on, so I can know who is calling

18   or call them back.  I think that's clear.

19           THE COURT:  No question there might be a violation.

20   But the question is, what injury --

21           MR. BANK:  Right.  The injury is that in making the

22   call, when the defendant made the call -- not the defendant,

23   whoever made the call.  In making the call, the defendant was

24   taking -- was causing, I should say, the caller, was causing

25   there to be a reasonable risk that a recipient would not be

44

1    able to contact the caller or entity who made the call.  The

2    fact that they don't know that I'm going to press it, maybe I

3    get this phone, and I am sick of it, and maybe -- there's

4    usually, I think there was in this case, if you don't want

5    more calls, press "3," but that still wouldn't help me contact

6    anybody.  It is the risk of harm.  There's no question they

7    posed -- it didn't turn out that way, I know that.  I did call

8    them.  I did press "1."  I did speak to them.  Of course, I

9    know that.

10            But the question is, was there the risk of harm?

11   Well, there was a very reasonable risk, from the caller's

12   perspective, that I wasn't going to press "1," okay, meaning

13   that I just would have pressed nothing, or I would have

14   pressed another key to, theoretically, try to stop more of

15   these annoying phone calls.  So they -- by not engaging these

16   disclosures -- I think it's just common sense what their

17   purpose is, they necessarily posed that risk of harm.

18            THE COURT:  Okay.  All right.  I understand your

19   argument.  But as you can probably tell, I am not particularly

20   convinced on that claim, which will obviously affect your

21   class action based on the state law claim.

22            But if you want to be heard on this, Mr. Asnen, you

23   can be, but I'd prefer to turn to the class allegations as

24   they relate to the TCPA claim.

25            MR. ASNEN:  Okay.  I think Your Honor did a good job

1   following the GBL claim.

2          THE COURT:  Okay.  So the question I have, although

3   I think I'm not inclined to dismiss the class claims

4   themselves, putting aside for the moment the prior discussion

5   about the TCPA violation itself, and the identity of the

6   parties, the concern, obviously, is that as defendant has

7   argued, Mr. Bank only received a call on his residential

8   telephone, and yet he seeks to certify a class of both -- or

9   makes allegations about a putative class of both cell phone

10  users and residential phone users, which are two separate

11  parts of the TCPA.

12          Now, I think you had argued, I believe, and correct

13  me, Mr. Asnen, that the TCPA doesn't cover -- or only covers

14  residential phone users.  That's plainly incorrect.

15          MR. ASNEN:  My argument was that the nonprofit

16  exemption only covers calls to the residential line.  They

17  don't apply to calls to cell phones.

18          THE COURT:  Okay.

19          MR. ASNEN:  So just as one example for how this

20  would not involve common issues of fact and law, and how no

21  amount of the discovery will change that, we have a nonprofit

22  exemption defense to calls, such as plaintiffs and calls that

23  he claims are similar to his, but to the extent he wants to

24  represent calls of people -- calls placed to cell phones, of

25  which he did not receive, we would not have such a defense.

46

1      THE COURT:  Okay.  Understood.

2      So, I mean, I think the only question then is -- so

3  you're saying you're not making an argument about the class,

4  including cell phone users, with respect to any claims against

5  Freedom Financial, correct?

6      MR. ASNEN:  I am not sure I understood.

7      THE COURT:  So you're saying that it's CGA, as a

8  nonprofit, can't be held responsible for anything other than

9  automated calls, or calls made to residential phones?  That's

10  what you're saying?

11      MR. ASNEN:  Well, I think our point is that the

12  existence of this exemption defense is emblematic of the fact

13  that counsel cannot represent a class of persons who received

14  calls, both on their residential line and their cell phone.

15  In addition to the fact that he, himself, did not receive a

16  call on his cell phone.

17      THE COURT:  But couldn't you have subclasses?  I

18  mean, in other words --

19      MR. ASNEN:  I mean, that's not alleged.

20      THE COURT:  Oh.  But, I mean, I think some of these

21  issues are perhaps premature, because the certification

22  question really doesn't go to dismissal of the claims, or even

23  striking them.  I think at this point the question becomes,

24  down the road, will that prevent certification or affect

25  certification.  But the case law does seem pretty clear that,

1     right now, it wouldn't be appropriate for me to judge some of

2     these potential certification issues, even, quite frankly, the

3     fact that Mr. Bank may not be able to represent individuals

4     who were called on their cell phones, one could argue.  It

5     seems to me the majority of the case law says that's a

6     question to reserve for certification, and unless there's

7     really some jurisdictional or fundamental defect in the claim

8     that's being raised for class certification, that I should not

9     entertain a motion to strike or to dismiss the class

10     allegations at this point.  That's at least my reading of

11     these -- the majority of cases.

12          So that I'm not inclined to do.  In other words, if

13     I find that Mr. Bank has stated a TCPA claim against either/or

14     both defendants, I'm likely to leave the class claims as is

15     for now, and then save them for a later day and later argument

16     on the certification question.  And, obviously, Mr. Bank

17     realizes he can't represent the class as a lawyer, or serve as

18     class counsel.  But that's an issue for another day as well.

19          So that's my inclination on that, unless you want to

20     say something further on that particular issue.

21          MR. ASNEN:  Well, you touched upon jurisdictional

22     defect with regard to the class claims, and I'm curious

23     whether or not Your Honor viewed that as touching upon the

24     arguments on the personal jurisdiction of absent members.

25          THE COURT:  Well, go ahead.  You can talk about

1    that.  That would potentially be an argument, the

2    Bristol-Myers argument, you mean?

3                MR. ASNEN:  Correct.

4                THE COURT:  Yeah, I mean, part of the problem I

5    think you have there is that that case, obviously, arose in

6    the context of a state prosecution.  So a bunch of

7    non-California plaintiffs went to California and sued

8    Bristol-Myers, which isn't the California company, and there

9    the Supreme Court basically found that that couldn't be done,

10   because there was no personal jurisdiction of the state court.

11               I think there's a fundamental question about whether

12   Bristol-Myers would extend to a federal class action being

13   brought here, and, quite frankly, I don't know if I would

14   address the personal jurisdiction claim right now.  But it

15   does seem to me you have a New York resident who is alleging

16   that he was contacted here in New York by defendants or one of

17   the defendants, and I don't think the same issues or the same

18   arguments can be applied.  Plus, fundamentally, I'm not

19   confident that Bristol-Myers has, or I would say, that

20   Bristol-Myers should be applied in a federal case such as

21   this.  And I don't think the case law right now is

22   particularly strong on that.

23               So to avoid, I think, a potential error, I would not

24   go that route in terms of the class allegations.  Essentially,

25   I think, if I -- as I said before, for me, the inquiry is more

49

1    about whether or not Mr. Bank has adequately stated the actual

2    TCPA claims against both defendants.  And that will determine

3    whether or not he gets to proceed as well, based on these

4    class allegations.

5            So when I said jurisdictional, I wasn't actually

6    referring to that, because I don't think the Bristol-Myers

7    argument is a particularly strong one, just given how

8    undeveloped the case law is right now.

9            MR. ASNEN:  I don't know that this is necessarily

10   settled either, where district courts have uniformly found

11   that Bristol-Myers has no application to federal cases.  I

12   think that within TCPA, I think there is a strong basis to say

13   it does apply because the TCPA doesn't authorize nationwide

14   service of process, so this court would have to apply state

15   substantive service of process, jurisdictional law, so I think

16   that there is a case to be made that where intuitively

17   nonresident class members would be bringing claims against

18   defendants who are not New York citizens, those claims

19   necessarily would have no nexus to New York.

20           THE COURT:  I think, again, that may be an issue for

21   certification, but I don't think they're appropriate now in

22   terms of actually striking the class allegations.  So that I

23   wouldn't do.

24           So here's what I am prepared to do, folks.  I am

25   going to issue a decision in fairly short order.  You probably

50

1    have some idea at least where I am going, or at least

2    Mr. Bank, you probably do on the state law claim, but I will

3    mull it over more in terms of your argument that you've

4    clarified or reiterated.

5             MR. BANK:  Thank you.

6             THE COURT:  And then we will go from there in terms

7    of discovery, if the case is going to go forward.

8             MR. ASNEN:  Can I understand something?

9             THE COURT:  Yes.

10            MR. ASNEN:  On the state law claim, to the extent

11   you are inclined to revisit your own intuition.  I would be

12   remiss if I didn't bring up the *Jenkins* case from this court

13   where that -- these issues have been briefed and decided

14   within this court, and that court ultimately determined that

15   omissions of information on these phone calls, while there may

16   be a violation, again, counsel would not be prejudiced to

17   bring these in state court, where they would obviously have

18   jurisdiction.  That's not enough to necessarily rise to the

19   level of the concrete injury needed for standing, and I think

20   that it would also be worth noting that there was no risk of

21   injury here because Mr. Bank ultimately got these people's

22   numbers and spoke with them.  So --

23            THE COURT:  He got many numbers, apparently.

24            MR. ASNEN:  He's operating in a hypothetical world

25   for the purposes of this claim.

1        THE COURT:  Right.

2        MR. BANK:  Can I briefly respond?

3        THE COURT:  Yes.  Go right ahead.

4        MR. BANK:  Thank you.

5        First, a key distinction, which we talked -- I

6    talked about on pages 8 or really page 9 of the brief that

7    deals with the state law claim, is that in *Jenkins*, and the

8    court emphasized this, that none of the required information

9    was disclosed, but there was a phone number that was

10   disclosed.  At least by disclosing a phone number, I don't

11   think a fake caller ID number like I had, but by disclosing a

12   phone number presumably, as was the case in *Jenkins*, the

13   recipient -- that enabled the recipient to contact the call or

14   the entity on whose behalf the call was made.  And, again, I

15   can only emphasize, I guess one last time, it is the risk of

16   harm.

17       I acknowledge, I bring forth -- obviously, I

18   contacted the defendant, or defendants, they got multiple

19   numbers.  Once I knew who one was, and one thing led to the

20   other, but it is the risk.  They did create that risk, and

21   that's not in dispute, I don't think.

22       THE COURT:  I just don't happen to agree with you

23   that your risk of harm theory is one that should be applied in

24   this context, recognizing the very limiting nature in which

25   that theory has been applied is an exception to the general

52

1    rule that a bare violation of a statute without any attendant

2    harm doesn't -- isn't enough, because it really -- the cases

3    that you mention are really quite different in kind in terms

4    of the actual risk, or -- and the harm that was at risk there.

5    So I just don't view this as comparable.

6              MR. BANK:  I do think the principles are the same.

7    Yeah, the contexts were different, but I think the principle

8    in my case and in the *Adkins* and *Public Citizen*, in terms of

9    standing, I think the principles are the same in whatever

10   context there might be, at least the one here and the one in

11   the two Supreme Court cases that I mentioned.

12             THE COURT:  Yeah, I just think there's a difference

13   in degree, maybe, and kind, but certainly in degree, and I am

14   not sure that I can adopt your theory.

15             So all right.  So is there anything else either side

16   would like to say before I let you both go?

17             MR. ASNEN:  I don't think so.

18             MR. BANK:  No.

19             THE COURT:  Thank you.  Very much.

20             MR. BANK:  Thank you, Your Honor.  Thank you for

21   your time.

22             MR. ASNEN:  Thank you.

23             (WHEREUPON, at 3:16 p.m., the proceedings were

24   concluded.)

25

# Exhibit "B"

## Invoice for the Transcript of Oral Argument

## December 11, 2018

# Invoice

| INVOICE NO. | DATE SENT | DATE DUE | AMOUNT DUE |
|---|---|---|---|
| 20190036 | 5/16/2019 | 5/24/2019 | $243.36 |

| INVOICE FOR | SEND PAYMENT TO |
|---|---|
| Todd C. Bank<br>119-40 Union Turnpike<br>Fourth Floor<br>Kew Gardens, NY  11415<br>718-520-7125 | Annette M. Montalvo<br>PO Box 1647<br>New York, NY  10028 |

Tax ID: (EIN) 81-1329264
(W9 enclosed or on file)
Office: 718-804-2711
annette.montalvo@gmail.com

| ITEM | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 14 Day original | Oral Argument - 12-11-2018<br>18cv1311 | 52 | 4.68 | 243.36 |
| 14 Day original | PDF transcript emailed on 5-16-2019 | | | 0.00 |
| | PREPAYMENT HAS BEEN WAIVED - PAYMENT IS DUE UPON RECEIPT OF TRANSCRIPT. | | | 0.00 |
| | THANK YOU! | | | |
| | Bank-v-CreditGuard of America, et al.<br>18cv1311 | | | 0.00 |
| | United States District Court<br>Eastern District of New York | | | |
| | Judge Pamela K. Chen | | | |

| | | | Total | 243.36 |
|---|---|---|---|---|
| | | | Balance Due | 243.36 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TODD C. BANK, Individually and on Behalf of
All Others Similarly Situated,

                              *Plaintiff*,

            -against-

CREDITGUARD OF AMERICA, INC., FREEDOM DEBT
RELIEF, LLC, FREEDOM FINANCIAL NETWORK, LLC,
and FREEDOM FINANCIAL NETWORK FUNDING, LLC,

                              *Defendants*.

1:18-cv-01311-PKC-RLM

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR SANCTIONS AGAINST COUNSEL TO FORMER DEFENDANT
PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

TODD C. BANK,
 ATTORNEY AT LAW, P.C.
119-40 Union Turnpike
Fourth Floor
Kew Gardens, New York  11415
(718) 520-7125
By Todd C. Bank

*Counsel to Plaintiff*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

CONSTITUTIONAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      DEFENSE COUNSEL, FAR FROM BEING ENTITLED TO HAVE
        SANCTIONS AWARDED IN FAVOR OF ITS CLIENT, SHOULD
        BE SANCTIONED FOR MAKING A FRIVOLOUS MOTION . . . . . . . . . . . . . . . . . 3

        A.      This Court Clearly Did Not Believe that
                the Claim at Issue was Frivolous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      CGA's Request for Injunctive Relief is Frivolous . . . . . . . . . . . . . . . . . . . . 5

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# TABLE OF AUTHORITIES

Page

## CONSTITUTIONAL PROVISIONS

U.S. Const., Art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATUTES

47 U.S.C. § 227 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## CASES

*Arnold Chapman & Paldo Sign & Display Co.*
  *v. Wagener Equities Inc.*,
    747 F.3d 489 (7th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bais Yaakov of Spring Valley v. Educational Testing Service*,
    367 F. Supp. 3d 93 (S.D.N.Y. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Cunningham v. Rapid Response Monitoring Svcs., Inc.*,
    No. 15-cv-00846, 2017 WL 1489052
    (M.D. Tenn. Apr. 26, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*In re Hartford Textile Corp.*,
    681 F.2d 895 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*In re Martin-Trigona*,
    737 F.2d 1254 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Mey v. Venture Data, LLC*,
    245 F. Supp. 3d 771 (N.D. W.Va. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

*Murray v. GMAC Mortg. Corp.*,
    434 F.3d 948 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Robert W. Mauthe, M.D., P.C. v. MCMC LLC*,
    No. 18-cv-1901, 2019 WL 2088054
    (E.D. Pa. May 13, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD C. BANK, Individually and on Behalf of All Others Similarly Situated,<br><br>                                            *Plaintiff*,<br><br>-against-<br><br>CREDITGUARD OF AMERICA, INC., FREEDOM DEBT RELIEF, LLC, FREEDOM FINANCIAL NETWORK, LLC, and FREEDOM FINANCIAL NETWORK FUNDING, LLC,<br><br>                                            *Defendants*. | 1:18-cv-01311-PKC-RLM |

## INTRODUCTION

Plaintiff, Todd C. Bank ("Bank"), submits this memorandum of law in support of Bank's motion, pursuant to Rule 11 of the Federal Rules of Civil Procedure, for sanctions against Neil E. Asnen and Klein Moynihan Turco LLP ("KMT"), counsel to former Defendant, CreditGuard of America, Inc. ("CGA").

## PROCEDURAL BACKGROUND

As recounted in the affidavit of Neil E. Asnen, dated May 6, 2019 (Dkt. No. 54-1), all of the facts upon which CGA's motion for sanctions is based occurred before June 26, 2018, which is the date on which CGA, as required by Rule 11(c)(2), served, upon Bank, a motion seeking sanctions based upon Bank's assertion of a claim against CGA under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

On April 19, 2018, Mr. Asnen, on behalf of Defendants (that is, CGA and what are now the three remaining defendants), filed a pre-motion-conference letter (Dkt. No. 15) regarding Defendants' anticipated motion to dismiss the Complaint (Dkt. No. 1). Mr. Asnen's letter contained a section titled "The TCPA Excepts from Liability Tax-Exempt Non-Profit Entities Such as CGA." No mention of sanctions was made in that letter; nor did that letter contend that CGA's non-profit status rendered

1

Bank's TCPA claim against CGA frivolous.

On June 7, 2018, Defendants served a motion to dismiss the Complaint (Dkt. No. 1); like the pre-motion-conference letter, the motion, which sought, *inter alia*, dismissal of Bank's TCPA claim against CGA based upon CGA's non-profit status, did not contend that that status rendered Bank's TCPA claim against CGA frivolous nor sanctionable.

On June 11, 2018, Bank filed an Amended Complaint (Dkt. No. 20).

On June 22, 2018, Defendants filed a pre-motion-conference letter (Dkt. No. 21) regarding Defendants' anticipated motion to dismiss the Amended Complaint. Like the previous letter, this one also contained a section with the above-quoted title but did not contend Bank's TCPA claim against CGA was frivolous nor sanctionable.

On July 20, 2018, Defendants served a motion to dismiss the Amended Complaint (later filed as Dkt. Nos. 25-27), wherein Defendants, yet again did not contend Bank's TCPA claim against CGA was frivolous nor sanctionable; indeed, neither of Defendants' motions nor pre-motion-conference letters referred to the motion for sanctions that Defendants had served. The same is true of Defendants' reply memorandum of law (Dkt. No. 33) in further support of the dismissal motion.

On December 11, 2018, the Court held oral argument on Defendants' motion to dismiss the Amended Complaint.

On March 22, 2019, the Court issued a Memorandum & Order (Dkt. No. 38) that, *inter alia*, dismissed Bank's TCPA claim against CGA.

On May 20, 2019, Bank, by ECF (Dkt. No. 51) and email, served, upon CGA's counsel: (i) Bank's opposition to CGA's motion for sanctions; and (ii) Bank's motion for sanctions against CGA's counsel pursuant to Rule 11. Service of Bank's motion constituted service in accordance with the 21-day 'safe harbor' of Rule 11(c)(2). *See* Bank's memorandum of law (Dkt. No. 51), *Nota Bene*, pp.1-2; letter from Bank to the Court (Dkt. No. 55), pp.1-2.

## ARGUMENT

## POINT I

## DEFENSE COUNSEL, FAR FROM BEING ENTITLED TO HAVE SANCTIONS AWARDED IN FAVOR OF ITS CLIENT, SHOULD BE SANCTIONED FOR MAKING A FRIVOLOUS MOTION

### A.  This Court Clearly Did Not Believe that the Claim at Issue was Frivolous

This Court, in the March 22, 2019, Memorandum & Order (the "Order"; Dkt. No. 38), did not even suggest that Bank's TCPA claim against CGA was frivolous; nor did Mr. Asnen make any such assertion during the oral argument. Indeed, during the oral argument, this Court, far from finding that Bank's TCPA claim against CGA was frivolous, unmistakably indicated that it found the claim to be *meritorious*:

> [U]nder the dual[-]purpose standard, I think they -- CGA, at least at this stage, *can't really rest on this immunity under -- or exception under the TCPA*. Again, at the pleading stage, there seems to be a very close relationship established in not one, not two, but it seems like three different calls with representatives of both defendants' companies.
>
> So, again, *I just don't see how you avoid both the agency inference as well as the dual[-]purpose inference*, when, in fact, they are both saying, when it doesn't work for Financial Federal (sic.), they send the caller to CGA. At that point, certainly CGA seems to be acknowledging that Federal Financial is making these dual[-]purpose calls on its behalf. Either it is going to be a commercial call that Federal Financial will handle, or it is going to be a referral to CGA, for those who don't qualify.
>
> Once they sort of align themselves or link themselves to Federal Financial, *I don't think, at this stage at least, they can hide behind this exemption for nonprofits*.

Transcript of Oral Argument, Dec. 11, 2018, at 13:24 - 14:17 (emphases added, as are all emphases when herein quoting the transcript) (a copy of the transcript is annexed as Exhibit "A" to the Declaration of Todd C. Bank). *See also id.* at 16:23 - 17:6 ("if that initial call had a partially commercial component, which it did, because, again, there was a decision tree, if 'X' you go to

Federal Financial, if 'Y,' you go to CGA, then it seems to me *CGA shouldn't be able to avail itself of the exemption under the TCPA*. Because, in effect, they are *hiding* behind this Federal Financial company in some way to have them be the *stalking horse*, if you will, but, clearly, the initial contact, there's no question, was commercial in nature"); *id.* at 17:6-10 ("isn't it true that if there was a marketing component to this initial call to Mr. Bank, that that would meet the *dual[-]purpose definition*, at a minimum, assuming that there's then also an informational component?"); *id.* at 19:1-2 ("what we're quibbling about, though, is what does it mean to be exempt"); *id.* at 31:7-12 ("what you [(*i.e.*, Mr. Asnen)] are arguing for is a matter of policy, really, seems wrong, which is that so long as a company sets itself up as a nonprofit, they can do whatever they want. They could solicit business for -- or they can violate the automated call rule, that's what you would say, right?"); *id.* at 31:18 - ("[i]f the allegations are accepted as true, they suggest that -- or they reasonably suggest that CGA is basically working with Freedom Financial to make these calls to market services of either Freedom Financial or CGA, whatever the circumstances are, and that they are then *skirting, because they have this exempt status, the regulation that would prevent them from making automated calls*, and they shouldn't be held liable, but Freedom Financial should be, is essentially what you are arguing."); *id.* at 32:16 - 33:1 ("I guess the problem I am having is, A, *the FCC did say that there was this doctrine of dual purpose*. The fact that it hasn't been applied in any case, I don't know how compelling that is. Obviously, all the cases are very fact specific. But if I find that there's a reasonable inference that CGA either gave authority to or ratified the actions of Freedom Financial to make this marketing call on its behalf, as well as on behalf of Freedom Financial, so, therefore, a *dual[-]purpose call*, that CGA should still not be -- should still [sic] be exempted from the TCPA because of its status.").

Although the Court, in the Order, took a different view of the matter than had the Court during the oral argument, that changing of its view hardly meant, as would be necessary to support sanctions, that the Court's expressions during the oral argument were so fundamentally flawed as to

4

themselves have been the equivalent of frivolous (which, obviously, they were not).

CGA, in making much of the provision, by its counsel, to Bank, of evidence of GGA's non-profit status, misses the point entirely: the dispute before the Court was not over whether CGA was non-profit but whether that status rendered CGA exempt from Bank's TCPA claim. Thus, the number of times that CGA's counsel repeated, to Bank, that CGA was non-profit is irrelevant. Moreover, CGA's assertion that "CGA repeatedly advised Plaintiff that it cannot be held liable for the subject call at issue even when taking the FAC's allegations as true," CGA Mem. at 6, does not mean that CGA's counsel was right, much less that Bank's claim was frivolous. Although Bank responded each time with his own legal analysis (which, of course, was repeated in Bank's opposition to Defendants' dismissal motion), that, too, is immaterial; indeed, CGA's argument regarding frivolousness is equivalent to Bank's having argued, had the Court *upheld* Bank's claim, that CGA's counsel's position was frivolous on account of Bank's having repeatedly expressed his view to CGA's counsel.

Finally, CGA states: "[g]iven that in this case, [Bank] keeps his own counsel, Plaintiff's harassment of CGA with a patently frivolous suit is all the more egregious." CGA Mem. at 6. This simply makes no sense: whether Bank was (as is this case) representing himself, or had been representing a client, his obligation not to advance a frivolous claim would have remained the same. To be sure, Bank's claim was not frivolous in any event.

**B.    CGA's Request for Injunctive Relief is Frivolous**

CGA states: "[CGA's] request for monetary sanctions should be granted *in conjunction with* the imposition of injunctive sanctions against Plaintiff, enjoining future filings as appropriate. Despite being *pro se*, Plaintiff is a seasoned litigator who has attempted to litigate the same claims in this district over and over again," CGA Mem. at 8 (emphasis by CGA), for which CGA cites two Second Circuit opinions: *In re Martin-Trigona*, 737 F.2d 1254 (2d Cir. 1984), and *In re Hartford Textile Corp.*, 681 F.2d 895 (2d Cir. 1982) (*per curiam*). A simple recitation of the facts in those cases

shows that, even aside from the fact that Bank's claim against CGA was not frivolous, CGA's

invocation of those cases is plainly frivolous. In *In re Martin-Trigona*, the court recounted the facts

as follows:

> To those who follow the business of the courts, the appellant
> needs no introduction. He is the source of literally hundreds of
> lawsuits, motions and miscellaneous pleadings, *all but a small fraction
> of which lack any merit whatsoever*. Viewing [the appellant]'s
> litigious conduct in its entirety yields the inescapable conclusion that
> he *persistently resorts to legal processes without regard to the merits
> of the claims asserted* and that he invokes those processes largely to
> harass persons who have unluckily crossed his path. His abuse of legal
> processes is exemplified not only by the number and variety of
> *meritless* actions but also by his recent use of pleadings and other
> legal papers, the contents of which are set out in their appalling detail
> in the district court's opinion, as a vehicle to launch vicious attacks
> upon persons of Jewish heritage.

*In re Martin-Trigona*, 737 F.2d at 1256 (emphases added). In *In re Hartford Textile*, the court

recounted the facts as follows:

> This case, which has *an almost unparalleled history of
> frivolous and repetitious claims, motions, petitions, demands, and
> appeals*, arose out of the bankruptcy court's denial of [the] appellant's
> claim for $80,000 sales commissions allegedly owed to [the]
> appellant's deceased husband. Before this Court heard argument on
> the merits for the first time, [the] appellant already had made at least
> twenty-five motions, *most of which were meritless and repetitious*.
> Among them were motions to disqualify the bankruptcy judge and
> [the defendant]'s attorneys and for the appointment of a special
> prosecutor. *We stated then that we did not condone the course of
> conduct that appellant's counsel had pursued*.

*In re Hartford Textile*, 681 F.2d at 897 (emphases added; citations omitted).

CGA notes that, "[t]he Second Circuit has identified [certain] factors as being relevant in

resolving an application for anti-litigation-related injunctive relief," CGA Mem. at 9, and that, "[a]n

analysis of [those] factors and considerations weighs heavily in favor of issuing the requested

anti-filing injunction." *Id.* Regarding the first of these factors, *i.e.*, "the litigant's history of litigation

and in particular *whether it entailed vexatious, harassing or duplicative lawsuits*," *id.* (emphasis

6

added), CGA states: "[o]n the first factor, Plaintiff's history of filing TCPA claims in this district alone is prolific." *Id.* That is (relatively) true, but CGA does not even purport to claim that any of this litigation history, let alone a substantial amount of it, "entailed vexatious, harassing or duplicative lawsuits." To be sure, CGA elsewhere refers to "[Bank's] long history of meritless claims," CGA Mem. at 11, but, again, provides no details, much less the type of history that could warrant the injunction that CGA seeks.

In *Cunningham v. Rapid Response Monitoring Svcs., Inc.*, No. 15-cv-00846, 2017 WL 1489052 (M.D. Tenn. Apr. 26, 2017), the court rejected the notion, advanced here by CGA, that a person is somehow obligated not to be a "prolific" filer of TCPA cases:

> [The] plaintiff's *numerous lawsuits* show that he is *acutely aware of his rights under the TCPA* and the *potential that he could reap monetary rewards* from them. . . . [I]t is safe to say that, when the telemarketers in this case called a phone belonging to [the] plaintiff], they—presumably unwittingly—found themselves in the sights *not of an ordinary hapless consumer*, but a *seasoned plaintiff*, likely *primed and ready to take them to court* if their actions violated the TCPA.

*Id.* at *4 (emphases added). However, "[n]othing in the Constitution, though, requires a plaintiff to be a naïf. Litigation is not college athletics: there is no 'amateurs only' rule." *Id.*, citing *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006).

*Cunningham* further explained:

> The statutory damages available under the TCPA are, in fact, *specifically designed to appeal to plaintiffs' self-interest* and to *direct that self-interest toward the public good*: "like statutory compensation for *whistleblowers*," they "operate as *bounties*, increasing the *incentives* for *private enforcement* of law." *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). Designing a cause of action with the purpose of enlisting the public in a law's enforcement scheme is a *well-established tool* that can be found in areas ranging from antitrust and civil[-]rights law to environmental law and false claims.

*Id.* (emphases added).

In *Cunningham* as in the present case, "[the] [d]efendants suggest[ed] that, by becoming a so-called 'professional plaintiff,' [the plaintiff] has forfeited [his] rights because the calls alleged were not truly unwanted." *Id.* at \*5. The court rejected this suggestion, comparing a typical 'serial' plaintiff with one who went *out of his way* to generate TCPA claims (which CGA does not even suggest is the case here) and was found, as a result, to lack an injury as required of Article III standing (a result with which, incidentally, *Cunningham* disagreed). *See id.* (concluding the discussion noting that, "[t]he [d]efendants seem to imagine a Constitution that limits the right to sue under the TCPA to those who are ignorant of their right to sue under the TCPA.").

According to CGA, a person who receives, for example, 50 unlawful robocalls better let slide a certain number of them (but who knows how many before it shall become 'open season' for telemarketers to violate the person's rights with impunity?). CGA's "professional plaintiff" argument is, again, transparently specious. *See also Murray v. GMAC Mortgage Corp.*, *supra*, in which the court observed: "[t]he district judge regarded [the plaintiff and her family members] [as] . . . professional plaintiffs. . . . What the district judge did not explain, though, is *why* 'professional' is a dirty word. . . . The district judge did not cite a *single decision* supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders." *Murray*, 434 F.3d at 954 (emphases added). The "professional plaintiff" nonsense that CGA self-servingly advocates was again rejected in *Bais Yaakov of Spring Valley v. Educational Testing Service*, 367 F. Supp. 3d 93, 114-116 (S.D.N.Y. 2019); *see also Robert W. Mauthe, M.D., P.C. v. MCMC LLC*, No. 18-cv-1901, 2019 WL 2088054 (E.D. Pa. May 13, 2019) (same); *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 783 (N.D. W.Va. 2017) ("[t]t is true that the plaintiff has brought a number of TCPA cases. It is further true that she has telephone answering and recording equipment which is more sophisticated than that of the average consumer. It is not true that she seeks to receive such calls. She does nothing to attract the calls; in fact, her telephone number is listed on

the National Do Not Call Registry. Rather, she uses her equipment to record and document TCPA calls when they do occur. This does not deprive the plaintiff of standing any more than the purchase of a burglar alarm would indicate that the homeowner wanted her house to be broken into" (although Bank's telephone number is listed on the National Do Not Call Registry, the call at issue in this case was unlawful without regard to that fact; and, of course, the mere lack of such a listing would not constitute an invitation for such calls any more than a person *without* a home-alarm system could thereby be deemed to be inviting burglars into his home)).

CGA makes the nonsensical argument that Bank's recent motion practice, which concerned Bank's state-law claim, somehow warrants sanctions with respect to the claim that *is* at issue, *i.e.*, Bank's TCPA claim against CGA. *See* CGA Mem. at 10. As if this were not bad enough, CGA, while complaining, with respect to the latter claim, that "CGA has incurred significant costs in the form of attorneys' fees," *id.* at 7, does not note that, with respect to the recent motion practice, CGA opposed only Bank's motion for reconsideration but not any of the subsequent motions (nor does CGA note this when it reiterates his complaint regarding legal fees, *see* CGA Mem. at 11). Moreover, given the very nature of a motion for reconsideration of a dismissed claim, Bank obviously could not have withdrawn that claim in response to CGA's motion for sanctions; indeed, CGA filed its motion for sanctions after the recent motion practice ended.

Finally, CGA states: "[Bank's] abuse of the judicial system mirrors nearly identically the pattern of behavior as exhibited by Plaintiff in another action pending in the Eastern District, *Bank v. Fluent, Inc. et al*, 1:18-cv-3307. There, over the course of two days, Plaintiff filed seven (7) motions strike defendants' answer, each in violation Judge Kuntz's Individual Rules and denied accordingly." CGA Mem. at 10 (footnote omitted). Mr. Asnen, who represents the defendants in that case, omits the facts that no finding of frivolousness was made, that sanctions were neither requested nor imposed, and that the matter is currently the subject of a mandamus petition in the Second Circuit

(No. 19-219op). Indeed, CGA does not even inform this Court that, in *Fluent*, Bank is challenging, *inter alia*, the district court's individual-practice rule concerning pre-motion conferences with respect to a motion (*i.e.*, a motion under Rule 12(f)(2)) that has a time limit for being filed; much less does CGA explain why that challenge is frivolous.

## <u>CONCLUSION</u>

Bank requests the following: (i) that the Court grant, to Bank, in either the form of costs of sanctions, Bank's reasonable expenses, including, but not limited to, $243.36 for the cost of the transcript of the oral argument before this Court on December 11, 2018; and (ii) that the Court grant, to Bank, any additional just and proper relief.

Dated: June 12, 2019

 s/ *Todd C. Bank*
TODD C. BANK,
  ATTORNEY AT LAW, P.C.
Todd C. Bank
119-40 Union Turnpike
Fourth Floor
Kew Gardens, New York  11415
(718) 520-7125
By Todd C. Bank

*Counsel to Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 12, 2019, a true and accurate copy of the foregoing document is being filed electronically via the Court's electronic-filing (ECF) system. Notice of this filing will be sent to all parties by operation of the Court's ECF system and copies will be mailed to those parties, if any, who are not served via the Court's ECF system.

Dated: June 12, 2019

 s/ *Todd C. Bank*
TODD C. BANK